**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**William J. OSBORNE, Thomas E. Hanna and Joseph Urbano, Jr., also known as Toby Urbano, Defendants–Appellants.**

**Nos. 89–1182, 89–1367 and 89–1678.**

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1990.

Decided April 22, 1991.

Rehearing Denied June 6, 1991.

Joseph R. Wall, Asst. U.S. Atty., Milwaukee, Wis., for U.S.

Mark A. Schroeder, Consigny, Andrews, Hemming & Grant, Janesville, Wis., for William J. Osborne.

Daniel W. Hildebrand, Ross & Stevens, Madison, Wis., for Thomas E. Hanna.

Joseph R. Lopez, Chicago, Ill., for Joseph Urbano, Jr. aka Toby Urbano.

Before WOOD, Jr., and COFFEY, Circuit Judges, and NOLAND, Senior District Judge.*

COFFEY, Circuit Judge.

Defendants Thomas E. Hanna, William J. Osborne, and Joseph Urbano after entering into plea agreements were convicted of violations of federal narcotics laws. The defendants were convicted of one count of conspiracy to possess cocaine with intent to distribute under 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2 and the defendant Hanna was also convicted of one count of possession of cocaine with intent to distribute under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[1] Each of the defendants appeal their

* Honorable James E. Noland, Senior Judge of the Southern District of Indiana, is sitting by designation.

1. The defendants were sentenced under the Sentencing Guidelines. Hanna received concurrent sentences of seventy-five months imprisonment on the conspiracy and possession counts. He also received an additional consecutive sentence of twelve months imprisonment under 18 U.S.C. § 3147 because his conviction for possession of cocaine with intent to distribute arose from conduct that occurred while released on bond for the conspiracy count. Hanna was further given concurrent sentences of three years of supervisory release on each count to commence following his release from confinement together with a fine of $2,000. Osborne received a sentence of eighty months confinement on the conspiracy count with credit for time served prior to adjudication to be followed by a term of four years of supervised release and also ordered to pay a fine of $1,000. Urbano was fined $500 and received a sentence of forty-two months of imprisonment on the conspiracy count to be

sentences, while the defendant Osborne also appeals his conviction alleging that the government breached the plea agreement. We affirm.

## I. FACTUAL BACKGROUND

From September 1, 1987 to February 1, 1988, defendant Hanna, a Florida resident, supplied cocaine to the defendant, Osborne, in Wisconsin, and Osborne then resold quantities of the cocaine while retaining enough for his personal use. During the same period of time Urbano and Osborne transported cocaine between Florida and Wisconsin.[2]

In January of 1988, Hanna instructed Urbano to transport seven ounces of cocaine to Wisconsin and instructed that he conceal this cocaine in his crotch area while flying from Florida to Chicago, Illinois. Urbano distributed four ounces of this cocaine to Osborne, two ounces to co-conspirator Anthony Sciano and one ounce to another co-conspirator Randy Carroll.

On February 14, 1988, Osborne and Hanna flew from Florida to Chicago's O'Hare Airport, with Osborne carrying cocaine. Osborne and Hanna were met at the airport by Osborne's girlfriend, co-conspirator Debra Bauer and a confidential informant of the Wisconsin Department of Justice. Osborne, Hanna, Bauer and the confidential informant travelled via automobile from the airport to Wisconsin and, after the automobile crossed the Wisconsin border, Wisconsin state agents stopped the car and arrested the occupants, Osborne, Hanna and Bauer. Nine ounces (255.15 grams) of fifty percent pure cocaine (transported from Florida) were found in four plastic bags in Bauer's purse. In addition, Hanna's briefcase, seized during the search, contained ledgers of past drug transactions.

Following his arrest, Hanna, while released on bond, contacted one Randy Carroll, a former co-conspirator, and advised him that he would continue to supply him with cocaine.[3] Shortly thereafter, on March 23, 1988, Hanna traveled from Florida to an unspecified location in northern Illinois, sold Carroll an ounce of cocaine, and discussed arrangements for future cocaine sales. A week later, on the 30th of March, Hanna met with Carroll at co-conspirator Sciano's bar, gave Carroll one ounce of cocaine and received $650 in cash owed from an earlier cocaine delivery. Following this sale, Hanna was arrested and the marked "buy money" was confiscated from his person.

## II. ISSUES PRESENTED

The parties' appeals present the following issues: (1) Are the Sentencing Guidelines applicable to Osborne and Urbano's convictions, considering that the conspiracy commenced prior to the effective date of the Guidelines and continued thereafter; (2) was the trial court's action in imposing a term of supervised release in addition to Osborne's prison sentence and fine for conspiracy under the former version of 21 U.S.C. § 846 proper; (3) did the district court's procedure conform to Section 6A1.-3(b) of the Guidelines, in sentencing Osborne, when it allegedly failed to provide the defendant with tentative findings of facts; (4) was the trial court's finding that Osborne was responsible for 630 grams of cocaine proper in calculating his sentence under the Sentencing Guidelines; (5) did the district court err in granting a two level enhancement under Section 3C1.1 of the Sentencing Guidelines based upon Osborne's obstruction of justice; (6) did the district court err in denying a two level reduction to each of the defendants, Hanna and Urbano, under Section 3E1.1 of the Sentencing Guidelines based upon their failure to accept responsibility for their conduct; (7) did the district court err in denying Urbano either a four level reduction under Section 3B1.2(a) of the Guidelines as a "minimal" participant in the crim-

followed by a term of three years of supervised release.

2. During the conspiracy the defendant Urbano, lived in Hanna's Florida residence and received room, board plus a small salary for housekeeping and child care services.

3. Hanna was unaware that Carroll was now cooperating with the government.

inal operation or a two level reduction under Section 3B1.2(b) of the Guidelines as a "minor" participant in the criminal activity; (8) did the trial court properly classify Urbano's criminal history under Category II; and (9) did the government breach its plea agreement with Osborne when it recommended that his sentence be adjusted upward for obstruction of justice and that he be classified in Criminal History Category III rather than Category I?

## III. APPLICABILITY OF THE SENTENCING GUIDELINES

Osborne and Urbano, sentenced under the Sentencing Guidelines, contend that the Guidelines should not apply to sentencing for their criminal activity that commenced prior to November 1, 1987, even though the conspiracy continued after that date.[4] Their briefs also contend that application of the Guidelines would be in violation of the Constitution's *Ex Post Facto* Clause because it commenced prior to November 1, 1987.

In *United States v. Fazio*, 914 F.2d 950, 959 (7th Cir.1990), we held that:

> "Although this circuit has not yet had occasion to consider whether the Guidelines applied to a defendant whose offense begins before the effective date of the Guidelines but continues beyond the effective date of the Guidelines, the other circuits that have considered the issue unanimously have concluded that application of the Guidelines in such a case does not violate the ex post facto clause. We see no reason to deviate from the reasoning of these circuits on this issue. Thus we conclude that the district court did not err in sentencing Mr. Fazio under the Federal Sentencing Guidelines."

(Footnotes omitted). *Fazio* states that it was the intention of Congress in adopting the Sentencing Guidelines that they apply to convictions for criminal conduct that began prior to the effective date of the Guidelines and continued after that date, and that this application was consistent with the *Ex Post Facto* Clause of the United States Constitution. *See also United States v. McKenzie*, 922 F.2d 1323, 1328 (7th Cir.1991) (No violation of *Ex Post Facto* Clause in application of Sentencing Guidelines to conduct that commenced prior to the Sentencing Guidelines' effective date and continued thereafter). Thus, the trial court's use of the Guidelines in imposition of sentence upon Osborne and Urbano, where the conspiracy commenced prior to the effective date of the Guidelines and continued thereafter, was appropriate.

## IV. SUPERVISED RELEASE

Osborne argues that the trial court improperly sentenced him to a term of supervised release upon the completion of his prison confinement, relying upon the United States Supreme Court's decision in *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), where the Court held that the terms of the federal narcotics conspiracy statute, 21 U.S.C. § 846, then in effect did not permit a sentencing court to impose a "special parole term" in addition to imprisonment. The *Bifulco* Court reasoned that "special parole" did not come within the framework of the language "imprisonment or fine or both" contained in the applicable text of 21 U.S.C. § 846. *See Bifulco*, 447 U.S. at 388, 100 S.Ct. at 2252. Osborne contends that application of the reasoning in *Bifulco* also requires a conclusion that a term of supervisory release is neither imprisonment nor a fine and, thus, may not be imposed under the language of 21 U.S.C. § 846 that applied both to *Bifulco* and to Osborne's case.[5]

4. November 1, 1987, was the effective date of the sentencing guidelines.

5. The former terms of 21 U.S.C. § 846 applicable to Osborne's case and in *Bifulco* provided:

> "Any person who ... conspires to commit any offense in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment proscribed for the offense, the commission of which was the object of the ... conspiracy."

In 1988 "Congress amended Section 846 to clarify that special penalty provisions such as mandatory minimum sentences and special parole terms imposable for substantive narcotics offenses are also applicable under this section." *United States v. Montoya*, 891 F.2d 1273, 1293 n. 25 (7th Cir.1989). However, this amendment

In *Montoya* we recognized that the terms of 21 U.S.C. § 846, that apply to Osborne's sentencing, did not expressly authorize special penalty provisions: "Where a conspiracy statute fails to make reference to special penalty provisions such as mandatory minimum periods of incarceration, the special penalties may not be imposed for convictions under the conspiracy statute." *Montoya*, 891 F.2d at 1293. *See also United States v. McNeese*, 901 F.2d 585, 602–03 (7th Cir.1990) (mandatory minimum sentences inapplicable under pre-amendment 21 U.S.C. § 846).

Although the text of 21 U.S.C. § 846 applicable to Osborne's sentencing did not explicitly permit a term of supervised release, it also did not forbid the imposition of supervised release. This point is significant as 18 U.S.C. § 3583,[6] authorizes the district court to impose a term of supervised release in sentencing for *any* felony or misdemeanor conviction where a defendant receives a term of imprisonment. 18 U.S.C. § 3583(a) reads:

> "**Inclusion of a term of supervised release after imprisonment**
>
> (a) **In general.**—The court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment, except that the court shall include as a part of the sentence a requirement that the defendant be placed on a term of supervised release if such a term is required by statute."

As we held in Section III, *supra*, Osborne's conviction involved felonious conduct occurring after November 1, 1987, and thus is subject to the Sentencing Guidelines. Applying this same reasoning, 18 U.S.C. § 3583, also effective on November 1, 1987, authorizes imposition of supervised release for violations of 21 U.S.C. § 846 committed after November 1, 1987.

Three other circuits that have previously considered this issue determined that 18 U.S.C. § 3583 authorizes a term of supervised release to be imposed as part of a sentence for a violation of the former 21 U.S.C. § 846 in the case of a conviction for criminal conduct that commenced prior to the November 1, 1987, effective date of 18 U.S.C. § 3583 and continued thereafter. In *United States v. Van Nymegen*, 910 F.2d 164, 166 (5th Cir.1990), the Fifth Circuit rejected a defendant's position identical to the one Osborne urges:

> "Van Nymegen relies on *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), where the Supreme Court held that § 846 authorized only punishment by fine or imprisonment, and did not authorize special parole terms. Because Congress did not amend § 846 until November 18, 1988, Van Nymegen contends that § 846 authorized punishment only by fine or imprisonment and that therefore, under *Bifulco*, he could not receive supervised release.
>
> Although § 846 did not provide for a term of special parole, Van Nymegen fails to recognize both that supervised release is not the equivalent of special parole and that the Sentencing Reform Act of 1984, Pub.L. No. 98–473 (codified as amended at 18 U.S.C. § 3551 *et seq.* (1985 Supp.1990)), is the source for the authority to impose supervised release in this instance. Authority for the imposition of supervised release for Van Nymegen's drug conspiracy conviction is found in 18 U.S.C. § 3583.
>
> * * * * * *
>
> Section 3583 became effective on November 1, 1987. Van Nymegen's conspiracy continued until February 6, 1988, and therefore occurred in part after the effective date of the provision."

(Footnote omitted).[7] In *United States v. Cardenas*, 917 F.2d 683, 687–88 (2d Cir.

became effective after Osborne's sentencing and Osborne was sentenced under the former language of 21 U.S.C. § 846 that the Supreme Court considered in *Bifulco*.

6. 18 U.S.C. § 3583 became effective November 1, 1987.

7. The Fifth Circuit followed *Van Nymegen* in a later decision, *United States v. Badillo*, 909 F.2d 849, 851–52 (5th Cir.1990), and at the same time

1990), the Second Circuit also recognized that 18 U.S.C. § 3583 permitted a term of supervised release for a conspiracy conviction under the former language of 21 U.S.C. § 846, noting: "Because no term of supervised release is authorized by § 846, the only statutory authority providing for supervised release is the catch-all provision 18 U.S.C. § 3583(b)...." [8] Finally, in *United States v. Jordan,* 915 F.2d 622, 631 (11th Cir.1990), the Eleventh Circuit also determined that 18 U.S.C. § 3583(a) provided the necessary authority for the imposition of a term of supervised release for one convicted of violating 21 U.S.C. § 846 involving a conspiracy continuing after November 1, 1987, and distinguished its decision from *Bifulco:*

> "There is ... one important difference between this case and *Bifulco:* namely, the enactment of 18 U.S.C. § 3583(a)....
>
> It is the existence of this statute that distinguishes this case from *Bifulco.* Pursuant to this statute, a federal district court has the power to impose a term of supervised release as part of any criminal sentence. This legislation provides the explicit authority for an additional sentencing option to the district court which *Bifulco* found lacking. Reading 21 U.S.C. § 846 *in pari materia* with 18 U.S.C. § 3583(a), we conclude that the district court properly possessed the statutory authority to impose a term of supervised release. *Accord United States v. Van Nymegen,* 910 F.2d 164 (5th Cir.1990)."

*Jordan,* 915 F.2d at 631 (footnote omitted). In accordance with the other courts of appeals (2nd, 5th and 11th Circuits) that have considered this issue, we hold that 18 U.S.C. § 3583 authorizes a district court to impose a term of supervised release in sentencing a defendant, like Osborne, who has been convicted of a narcotics conspiracy under 21 U.S.C. § 846 which was operative after the November 1, 1987, effective date of 18 U.S.C. § 3583, but terminated prior to the 1988 amendment of 21 U.S.C. § 846.

## V. THE DISTRICT COURT'S COMPLIANCE WITH SECTION 6A1.3(b) OF THE GUIDELINES

Osborne argues a violation of his due process rights during sentencing, stating that the court failed to provide him, prior to the sentencing hearing, with tentative findings of fact, setting forth the specific amount of cocaine he was held responsible for and the conduct constituting his alleged obstruction of justice, as required under Section 6A1.3(b) of the Guidelines. That section, designated as a "policy statement," provides:

> "The court shall resolve disputed sentencing factors in accordance with Rule 32(a)(1), Fed.R.Crim.P. (effective Nov. 1, 1987), notify the parties of its tentative findings and provide a reasonable opportunity for the submission of oral or written objections before imposition of sentence."

Osborne's sentencing was originally scheduled for November 2, 1988, but was continued to December 19, 1988, at the

expressed some reservations with *Van Nymegen*'s rationale. The court noted that a legitimate question might be raised why Congress would have needed to amend 21 U.S.C. § 846 in 1988 to authorize penalty terms such as supervised release if 18 U.S.C. § 3583 permitted courts to impose such a term:

> "We must attribute to Congress the knowledge that it had already enacted § 3583(a) in November 1987 when, with the express purpose of changing *Bifulco*'s rule, it enacted new § 846 in November 1988. Yet, our precedent says that in 1987 § 3583 added the power to impose a sentence of supervised release to § 846. This being so, and special parole having also in 1987 been taken out of § 841, there would no longer have been any reason to legislatively overrule *Bifulco* in 1988."

*Badillo,* 909 F.2d at 851.

8. *Cardenas,* 917 F.2d at 688. Although the Second Circuit held that imposition of supervised release for a conviction of violating 21 U.S.C. § 846 was authorized under 18 U.S.C. § 3583, it reversed the district court's imposition of supervised release because the length of the imposed supervised release term (ten years) exceeded the maximum of three years supervised release authorized under 18 U.S.C. § 3583(b), for the defendant's class C felony conviction. *See Cardenas,* 917 F.2d at 688 (citing 21 U.S.C. § 841(b)(1)(C) (20-year maximum term); 18 U.S.C. § 3559(a)(3) (Class C felonies less than 25, but 10 or more years maximum terms)).

request of Osborne and his attorney. In preparation for the December 19 sentencing hearing, the probation office prepared a pre-sentence report dated December 7, 1988. However, because Osborne's counsel informed the court that he had not had "sufficient time to review and comment upon the pre-sentence investigation," the court, once again at Osborne's request, continued the sentencing until December 28, 1988. Prior to this hearing date, Osborne, the government and the probation office filed written statements of their approval and/or challenges to the contents of the presentence report. In spite of the two prior continuances, Osborne's attorney, at the commencement of the December 28, 1988, sentencing hearing, requested a third continuance of the sentencing hearing to mid or late January 1989. In support of his request, Osborne stated that he "would like to have the opportunity to fully develop the facts with an independent investigation," but did not state any specific subjects requiring additional investigation. Osborne's repeated requests for continuances lead us to believe that his attorney had little if any respect for the trial court's busy schedule or for other litigants awaiting a trial date in an already over-capacitated system.[9] The court denied Osborne's request, reciting the continuances that had previously been granted and further stating:

> "Now, counsel, I still have not had demonstrated to me anything that would indicate other than the fact that you would like to conduct an independent presentence and submit it to the Court, that there is anything that the Court would gain or that any greater justice would be achieved by having the sentencing postponed until the end of January, it does appear that the public interest in this matter as well as that of the defendant which the Court must always be cognizant of, requires that there be some prompt disposition of these matters following the change of plea and the entry of a plea and the acceptance of that plea."

The defendant proceeded to engage in an overly extended two-day sentencing hearing, where he and the Government both presented evidence and argument concerning disputed sentencing factors. During the hearing the district court made specific findings on the record concerning each of the defendant's objections to the pre-sentence report. Indeed, the sentencing hearing was so unnecessarily lengthy that the district court judge made the following comments at the conclusion of evidence, just prior to pronouncing sentence:

> "Well, this Court has probably spent more time on this particular sentencing hearing than any other during the time that I have been on the Bench. It is fortunate for all of us that because of an early disposition of another matter scheduled for today, that we had a good part of the day, at least, to devote to this matter, because I do feel like Justice Harlan said many years ago, that no judge can know too much about the person that it is called upon the [sic] sentence."

The case law interpreting Section 6A1.-3(b) has not applied the rigid requirement for the tentative findings Osborne urges. For example, in *United States v. Mueller*, 902 F.2d 336, 347 (5th Cir.1990), the Fifth Circuit rejected a defendant's argument that the inflexibility of Section 6A1.3(b) of the Guidelines requires issuance of tentative findings prior to a sentencing hearing:

> "Mueller proposes that we construe Guidelines § 6A1.3 as requiring that the court resolve disputed facts prior to the sentencing hearing, issue them as tentative findings, and then allow a defendant to dispute those findings at the sentencing hearing. The commentary to this guideline qualifies the requirement for issuing of tentative findings with 'where appropriate,' thus suggesting the district court has discretion on this matter. Furthermore, section 6A1.3(b)'s 'reasonable

9. It reflects an attorney's attempt to stall or avoid the day of reckoning while wasting the court's time and ofttimes the defendant's finances particularly where counsel is unable to present a valid reason for a third adjournment.

opportunity for the submission of oral or written objections before imposition of sentence' could be satisfied here by the sentencing hearing itself, as Mueller had the PSI [pre-sentence investigation report] prior to the hearing and thus knew at the time of the hearing of all of the bases upon which the court eventually made its factfindings.

Mueller was given full opportunity to present the court with his written response to the PSI's findings and later to supplement his response with oral arguments at the sentencing hearing. Because the court merely adopted the PSI's findings, the PSI provided Mueller with adequate notice of all of the issues that the court resolved at the sentencing hearing. Thus, the court complied with the provisions of rule 32 and section 6A1.3."

*Mueller,* 902 F.2d at 347. As in *Mueller,* Osborne had more than ample opportunity to present written responses, oral arguments and evidence on all the disputed factual issues. Osborne's attorney, in the proper and timely preparation of his case, should have been able to adequately present Osborne's concerns at sentencing. If not, he should have rejected the case and transferred it to another attorney, possibly more well-versed in criminal law, in order that he might comply with the court's scheduling order as well as consider the other litigants and attorneys awaiting a trial date for a meritorious controversy.

Similarly, in *United States v. Walker,* 901 F.2d 21, 22–23 (4th Cir.1990) (per curiam), the Fourth Circuit, following a review of Section 6A1.3 of the Guidelines and its accompanying commentary, concluded:

"[W]e hold that the district judge's failure to notify the parties of his tentative findings prior to the sentencing hearing does not constitute reversible error. *The Guidelines do not require tentative findings in all cases. In appropriate cases, tentative findings are intended to help facilitate resolution of factual objections before the sentencing hearing, if possible. See* Guidelines § 6A1.2 and Commentary. Although the better practice is to make tentative findings and notify the parties of those findings before the sentencing hearing, in the instant case the district judge's failure to make tentative findings did not prevent substantial compliance with Guideline § 6A1.3(b). *The district judge received defendants' objections in advance of the hearing, provided the parties an adequate opportunity to address those objections at the hearing and resolve the disputed factors in accordance with Rule 32(a)(1), Fed.R.Crim.P., before imposition of sentence.* In fact, no defendant offered any evidence in support of the objections. *Each relied on his own statements and arguments of counsel addressed to the court at the sentencing hearing. The district judge provided the parties an adequate opportunity to present information on the record regarding the disputed factors.* Under the facts of this case, we conclude that the district judge's adoption of the presentence report's findings was not improper."

901 F.2d at 22–23 (emphasis supplied). In this case, as in *Walker,* the court received the defendant's objections in advance of the sentencing hearing, the parties had ample opportunity to offer evidence, challenges, and argument at the sentencing hearing and the court resolved the disputed factual questions.

Finally, in *United States v. Michael,* 894 F.2d 1457, 1461–62 (5th Cir.1990), the Fifth Circuit rejected a defendant's argument that the trial court violated Section 6A1.-3(b) in failing to notify him prior to the sentencing hearing of its "findings" concerning an upward departure from the Guidelines. The appellate court responded to this contention with a quotation from its earlier decision in *United States v. Burch,* 873 F.2d 765, 767–68 (5th Cir.1989), where it had held that:

" 'The method by which the district court chooses to address the requirements of Rule 32(c) and guideline 6A1.3(b) in a given case is for that court to select. As the guidelines direct, "[t]he sentencing court must determine the appropriate procedure in light of the nature of the

dispute, its relevance to the sentencing determination, and applicable case law." Sentencing Guideline 6A1.3, commentary. The only requirement we make is that the record reflect the trial court's resolution of any disputed sentencing factors in accordance with the federal rules and the guidelines.'"

*Michael,* 894 F.2d at 1461 (quoting *Burch,* 873 F.2d at 767–68). The Fifth Circuit went on to determine that the sentencing court's compliance with Section 6A1.3(b) was sufficient in spite of its failure to furnish the parties with tentative factual findings:

"Michael strenuously argues that he brought the disputed facts to the attention of the court, yet at the same time he alleges that he did not have proper notice of the court's findings to enable him to submit his own arguments in response. With regard to those findings that accepted the facts set forth in the government's resume, Michael had adequate notice. Where the court's factual findings were primarily a resolution of factual disputes between Michael and the government, Michael was on notice that the court would adopt either his proposed findings or the government's, and that he and his counsel should be prepared to submit supportive evidence. The fact that Michael was adequately apprised of the court's imminent resolution of the factual dispute, that the court announced its fact findings at the beginning of the hearing, and that it granted to Michael and his counsel an opportunity to make objections or present arguments in response, gave Michael the 'reasonable opportunity for the submission of oral or written objections before imposition of sentence' required by section 6A1.3(b).

Michael and his counsel had the opportunity in open court to submit any arguments they wished to make contesting the particular fact findings of the court. Moreover, before the court issued its sentence, it stated that it would be using its announced fact findings to justify departure from the guidelines, so Michael was aware of the consequences of not making any response or counter-arguments to those findings. Thus, the court complied with rule 32(a)(1). In summary, given that Michael was aware, prior to the hearing, of the issues in controversy, the court provided him with adequate notice of its tentative findings as required by guideline section 6A1.3(b) by announcing its findings at the beginning of the sentencing hearing giving Michael an opportunity to present objections."

894 F.2d at 1462 (footnotes omitted).

The case law developed interpreting Section 6A1.3(b), establishes that the purpose of the section is to require that a court present a defendant with an opportunity to address disputed factual issues prior to the court's consideration of sentencing.[10] The drafters of the Guidelines, after due reflection, hearings and careful consideration, advisedly saw fit not to establish an inflexible mandate that a district court must issue tentative findings prior to a sentencing hearing. Certainly the Due Process Clause does not require rigid adherence to such a procedure. The district court did more than simply comply with the basic policy underlying the Sentencing Guidelines and the Due Process Clause through its furnishing of the pre-sentence report to Osborne in a timely fashion, receiving his objections prior to hearing, allowing a full and complete opportunity to review and later to present extensive challenges and evidence and in resolving each and every factual question on disputed factual issues during an extended two-day sentencing hearing. Thus, the district court's procedures were more than sufficient under both the Sentencing Guidelines and the Due Process Clause.

## VI. OSBORNE'S RESPONSIBILITY FOR 630 GRAMS OF COCAINE

Osborne argues that the trial court erred in holding him responsible for 630

10. *See United States v. Cagle,* 922 F.2d 404, 408 (7th Cir.1991) (The district court must identify any factors outside the presentence report which he relied upon and give defense counsel opportunity to respond).

grams of cocaine rather than 434 grams of cocaine. Osborne and the government stipulated that Osborne possessed a total of 630 grams of cocaine during the conspiracy. But, Osborne urges that he should not be held responsible for 196 grams (5 ounces) of this total because he was merely transporting these drugs to other conspirators and he received no monetary benefit for this service. Specifically, Osborne contends that he transported two one-ounce packages of cocaine on February 2, 1988, for Hanna to be delivered to other individuals and that, on February 14, 1988, Hanna gave him three packages containing a total of five ounces of cocaine, which had been packaged, wrapped and labeled with the names of persons who were to receive them.

As a matter of law Osborne's contention that he should not be responsible for the entire 630 grams of cocaine is ill-founded, because a defendant convicted of a narcotics conspiracy is not merely responsible for the drugs in his immediate possession or control, but is also responsible for all of the drugs involved in the conspiracy's transactions during the time frame the particular conspiracy was in operation that the defendant knew of or should have reasonably foreseen. In *United States v. Guerrero*, 894 F.2d 261, 265–66 (7th Cir.1990), we held:

> "While there was no dispute that the conspiracy had distributed at least one kilogram of cocaine a year, the amount of drugs Guerrero was responsible for delivering to Lakis and the informant was disputed. This dispute, however, is of no consequence. Tom Guerrero pleaded guilty to conspiracy to distribute cocaine, 21 U.S.C. § 846, and was sentenced under section 2D1.4 of the Guidelines—*Attempts and Conspiracies.* Application note 1 to section 2D1.4 states that '[i]f the defendant is convicted of conspiracy, the sentence should be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy *that was known to the defendant or was reasonably foreseeable*' (emphasis added). This court has also noted that '[t]he amount of narcotics considered in sentencing for conspiracy includes not only the *amount involved in the transactions that were known to the defendant but also those that were reasonably foreseeable, reflecting the fact that each conspirator is responsible for the acts and offenses of each one of his co-conspirators committed in furtherance of the conspiracy.*' *United States v. Savage*, 891 F.2d 145, 151 (7th Cir. 1989). Section 1B1.3(a)(1) of the Guidelines, entitled *Relevant Conduct (Factors That Determine the Guideline Range)*, states that relevant conduct includes
>
> > 'all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.'
>
> Application note 1 to section 1B1.3 states that '[i]n the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.' Thus, a defendant who pleads guilty to a conspiracy charge is held accountable, for purposes of determining his relevant conduct and the applicable guideline range, for all drug transactions that he was aware of or that he should have reasonably foreseen."

*Guerrero*, 894 F.2d at 265–66 (footnote omitted) (emphasis supplied). Osborne admits that he delivered the cocaine for Hanna having full knowledge of the presence of the cocaine that he delivered to co-conspirators. In sentencing Osborne on the conspiracy conviction it is a ridiculous argument to make and immaterial that Osborne failed to obtain a monetary benefit from

the transportation of 196 grams of cocaine because all of the drugs he carried for Hanna were transported in furtherance of the conspiracy. Thus, the district court's decision to hold Osborne responsible for each and every one of the 630 grams of cocaine was proper, regardless of whether Osborne possessed these drugs for his own use or whether he received any financial benefit from acting as the courier for illegal drugs.

## VII. OBSTRUCTION OF JUSTICE—SECTION 3C1.1 OF THE GUIDELINES

Osborne contends that the district court improperly ordered a two level enhancement for obstruction of justice under Section 3C1.1 of the Guidelines based upon his alleged attempts to hire persons to kill potential government witnesses.[11]

During the sentencing hearing Special Agent John Palmer of the Wisconsin Department of Justice, Division of Criminal Investigation stated that Randy Carroll, an unindicted co-conspirator who volunteered to offer his help to the government in the investigation, and one Shirl Boomer, a confidential informant, would both testify at Osborne's conspiracy trial. Palmer testified that in November 1988 the Department of Justice received a message to contact Randy Carroll. As a result of his information, Palmer subsequently interviewed Carroll and Anthony West, an inmate of the Rock County Jail who had written a letter to Carroll.[12] West informed Agent Palmer that Osborne attempted to arrange for the killing of two government witnesses. West testified at the sentencing hearing and stated that when he and Osborne were confined in the Rock County Jail, Osborne attempted to hire him (West) and two other inmates, on separate occasions, to make Shirl Boomer and Randy "Keller" "disappear". With respect to Boomer, West stated that Osborne "said he would like to see him disappear, and he ... could come up with some money" in order "to have Boomer disappear." West also stated that Osborne "said that [Carroll] was another one he would like to see disappear." West recalled there being an offer of $5,000, but could not remember if it was for the killing of one or both of the witnesses. Osborne, in response to the testimony of Palmer and West, specifically denied discussing with West or any other inmates the possibility of having Carroll or Boomer disappear or be killed, and stated that he did not offer West money. On cross-examination Osborne did admit that on one occasion he had fired a shot into the ceiling of Carroll's business establishment during an argument over some missing cocaine. Osborne also admitted that in August 1988, when the threats on witnesses allegedly took place, he had knowledge of the fact that Carroll and Boomer possibly could be witnesses against him at trial.

After hearing the testimony, the court proceeded to make a finding based on the credibility of witnesses on the issue of whether Osborne obstructed justice. The court reasoned:

> "First of all, with respect to the information that was recently discovered regarding the defendant's attempted solicitation of an individual to kill two people who provided information to the government, this situation is, to term it, unfortunate is an understatement. The Court had the testimony of three witnesses who spoke directly to this problem, Mr. West and Mr. Osborne were in total disagreement as to what took place. And I must say that if there were such a thing as a credibility scale from one to ten, it would be difficult to find either one of them on the scale.

11. Guidelines Section 3C1.1 provides:
"*Obstructing or Impeding the Administration of Justice.* If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."

12. Carroll had received the letter from West. Although West referred to Randy Carroll as Randy "Keller," it is clear that the person whom West identified as Randy Keller was Randy Carroll.

The Court has to base this matter upon the limited information that was presented here, and I don't fault the attorneys for that, if, that's all you got, that's all you got.

The test, as I understand it, requires the Court to weigh the credibility in the same manner as a jury would raise the credibility as to the demeanor and the appearance, the other testimony of the person which seems to add or detract from the credibility. This Court understands that under the law the burden is upon the government to establish this by a preponderance of the evidence, and I guess there is no dispute as to that.

The testimony, after weighing this very carefully back and forth, seems to weigh more heavily in favor of the government. The Court, although not overly impressed with Anthony R. West, did seem to feel that he was, as he put it in his letter, ninety-nine percent truthful or truthful ninety-nine percent of the time. That might be a little high based upon what the Court observed here, but it did seem to give the impression that what he said in the letter would not normally be something that anybody would write to somebody else without any basis at all. He stands to gain nothing by it. While he might be looking for a job when he gets out, I just can't believe that he would have written this without some basis. To make up a store [sic] like that out of whole cloth seems to me to be beyond the abilities of Mr. West.

To say that Randy Carol [sic], Keller, was not a player here is somewhat ridiculous. Almost as ridiculous as Mr. Osborne's statement that he left him on good terms after having fired a gun into the ceiling, and that he meant him no harm. That's obviously beyond the bounds of this Court's imagination.

I can't help but believe that there is a great deal more than has come to this Court's attention. I am persuaded that this venture was not one that was ever destined to succeed, fortunately. I suspect it was more braggadocio and big talk by two people who were trying to out do each other, one representing himself to be tough, who is the equalizer in reverse, and the other pretending to be something that he isn't and wasn't, and having watched too much TV he decided that for $5,000.00 he could, as long as he was in jail and could explain that he couldn't get to his money, could make such offers and gestures. In any event the Court does find that such a statement was made and such an offer was made. And that while I don't put as much credence in it as perhaps some do, I do feel that it should be a factor, and that an appropriate adjustment in the offense level should be made, and increased from twenty-six to twenty-eight."

The court later added:

"Mr. Osborne, you are one of those people who seem to feel that if you relate facts as you would like them to be rather than they are, that people are going to believe them and accept them. I think you were a pathetic sight here yesterday, and today, not because of your stature that has absolutely nothing to do with it, but it was pathetic to have you sit here and relate these fantasies that you did to the Court with an ounce of truth and pound of fiction, and to expect the Court to believe them. I don't know, I suppose you could consider that as an insult to the Court's intelligence, but I would like to assume that it is a pattern that has been established in your lifestyle over many years, and perhaps you have gotten away with it in many instances. I don't really believe that you ever expected that somebody was going to carry out the plan that you tried to develop with Mr. West. That's not the point. The point is that in your mind you obviously thought that he was a vehicle that could carry it out. For all you knew, based upon your brief acquaintanceship with him he might very well have done it on the assumption that somehow you were going to come up with $5,000.00. I am more inclined to think it was just braggadocio, but whatever it was, it is something that we cannot and will not tolerate

in this society. And it has cost you dearly with additional time in incarceration."

A preponderance of the evidence is the standard required to demonstrate "obstruction of justice" in the trial court under the Guidelines. As we held in *United States v. White,* 888 F.2d 490, 499 (7th Cir.1989): "The Guidelines' standard for resolving disputes [in the trial court] is a preponderance of the evidence, not reasonable doubt." We further noted in *United States v. Ross,* 905 F.2d 1050, 1054 (7th Cir.1990): "Proof of sentencing factors under the Guidelines by a preponderance of the evidence satisfies due process."

In reviewing a district court's finding that a preponderance of the evidence supported a determination that a defendant obstructed justice, we have held that: "The sentencing court's determination that a defendant obstructed justice is ... a finding of fact. Thus, our review is under a clearly erroneous standard." *United States v. Brown,* 900 F.2d 1098, 1103 (7th Cir.1990). Under this standard of review:

> "A finding of fact is clearly erroneous only if, after reviewing all the evidence, the appellate court is left 'with the definite and firm conviction that a mistake has been committed.' *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Id.* at 574, 105 S.Ct. at 1511–12."

*Brown,* 900 F.2d at 1102. Furthermore, a trial court's factual finding based upon the credibility of witnesses will rarely be disturbed on appeal. As the Supreme Court observed in *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985):

> "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial court may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."

(Citations omitted).

In *Brown,* we applied the clearly erroneous standard to a finding based on credibility that a defendant obstructed justice under Guidelines § 3C1.1, and held:

> "In reaching its conclusion [that Brown obstructed justice] the district court assessed the credibility of the witnesses and concluded Haaris' testimony was more credible. 'It is [ ] well-settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact.' [*United States v. Zambrana,* 864 F.2d 494, 499 (7th Cir.1988).]. The trial court heard the testimony of the witnesses, observed their demeanor, and thus was in the best position to make a credibility determination. The sentencing court's conclusion is not clearly erroneous."

*Brown,* 900 F.2d at 1103.

From our review, we are convinced that, as in *Brown,* the district court made a well-reasoned determination, based upon the credibility of the respective witnesses, that Osborne obstructed justice as a result of his attempts to secure the services of other prison inmates to do away with government witnesses. The court commented on

the truthfulness of both the defendant and the prosecution's witness, Anthony West. But, as the court noted: "In any event such a statement was made and such an offer was made." The court was of the opinion that West would have had little motive to fabricate his account of Osborne's obstruction of justice. West's story was internally consistent and was not contradicted with extrinsic evidence. Thus, the trial judge's credibility-based decision that Osborne obstructed justice through his attempts to arrange for two government witnesses to "disappear" was free from clear error.

## VIII. ACCEPTANCE OF RESPONSIBILITY

Hanna and Urbano both argue that the trial court improperly denied them two level downward adjustments for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.[13]

In approaching the acceptance of responsibility issue:

> "[O]ur review of this issue is limited by the 'clearly erroneous' standard:
>
> > 'Whether or not a defendant has accepted responsibility for his crime is a factual question. The district court's determination of that question ... enjoys protection of the "clearly erroneous" standard. Because the trial court's assessment of a defendant's contrition will depend heavily on credibility assessments, the "clearly erroneous" standard will nearly always sustain the judgment of the district court in this area.' "

*United States v. Sullivan,* 916 F.2d 417, 419 (7th Cir.1990) (quoting *United States v. Thomas,* 870 F.2d 174, 176 (5th Cir.1989)). As we noted in *United States v. Camargo,* 908 F.2d 179 (7th Cir.1990): " '[T]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility,' and thus the judge's determination 'is entitled to great deference on review and should not be disturbed unless it is without foundation.' " 908 F.2d at 185. In *Sullivan* we recognized that the Guidelines authorize a trial judge to consider a number of relevant factors in determining whether a defendant has accepted responsibility:

> "The Application Notes following § 3E1.1 of the Guidelines sets forth a non-inclusive list of considerations that a court may use in determining whether a defendant 'clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct.' Several relevant considerations include: (1) voluntary termination or withdrawal from criminal conduct or associations; (2) voluntary and truthful admission to authorities of involvement in the offense and related conduct; (3) voluntary surrender to authorities promptly after commission of the offense; and (4) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility."

*Sullivan,* 916 F.2d at 420.

### A. *Hanna's Alleged Acceptance of Responsibility*

The probation officer in Hanna's pre-sentence investigation report recommended against granting Hanna a two-point reduction for acceptance of responsibility, noting that:

> "When re-interviewed he [Mr. Hanna] continued to refuse to admit his guilt saying everyone knew he was not a drug dealer. He denied a drug conspiracy existed. He states he is a victim of circumstances."

Based upon these facts the probation officer recommended denying the adjustment

13. Section 3E1.1 of the Guidelines states:

"§ 3E1.1 *Acceptance of Responsibility*

(a) If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels.

(b) A defendant may be given consideration under this section without regard to whether his conviction is based upon a guilty plea or a finding of guilt by the court or jury or the practical certainty of conviction at trial.

(c) A defendant who enters a guilty plea is not entitled to a sentencing reduction under this section as a matter of right."

for acceptance of responsibility because: "Although Mr. Hanna plead [sic] guilty, he has not admitted involvement in cocaine trafficking." [14] In arguing for an acceptance of responsibility adjustment Hanna claimed that his statements were misconstrued and, in a further self-serving but ridiculous statement, said that he honestly did not believe himself to be a drug dealer. He did, however, admit to making the statements to the probation officer referred to above, denying he was a drug dealer and the existence of a drug conspiracy. The trial court, after considering these arguments and the record, denied Hanna the two level adjustment for acceptance of responsibility relying upon Hanna's untruthful statements to the probation officer.

Hanna's statements to the probation officer during the preparation of the pre-sentence investigation report denying that he was a drug dealer and that a drug conspiracy existed cannot be considered a voluntary and truthful admission of his role in the cocaine conspiracy. Hanna expressed some remorse and greater truthfulness concerning his drug involvement at the final hour, the moment of sentencing, but his failure to demonstrate that same truthfulness and remorse prior to sentencing is certainly a factor upon which a judge might and could properly rely in determining that Hanna failed to accept responsibility. *See United States v. Pelayo-Munoz,* 905 F.2d 1429, 1431 (10th Cir.1990) (acceptance of responsibility adjustment properly denied where the defendant, despite expressing sorrow for his acts at the time of sentencing, denied awareness of drugs in his van during an interview with the probation officer who prepared his pre-sentence investigation report). Thus, the trial court's finding that Hanna failed to accept responsibility because he was untruthful in describing his criminal conduct in interviews with the probation officer during the preparation of his pre-sentence investigation report was proper.

### B. *Urbano's Acceptance of Responsibility*

The trial court also denied Urbano's request for an acceptance of responsibility adjustment.[15] The probation officer stated that even though Urbano was cooperating with the law enforcement authorities in their investigations of narcotics trafficking, his pre-sentence report recommended against Urbano receiving a two level downward adjustment for acceptance of responsibility. Furthermore, the probation officer declared that he believed that the statements Urbano made during the course of the presentence investigation reflected a denial of culpability. The pre-sentence report noted:

> "[Urbano] states on four occasions Mr. Hanna told him he had arranged to purchase automobiles in Wisconsin and asked him to travel there with the money to pick up the cars. He flew from Florida to O'Hare Field with sealed packages *which he presumed to be money for the purchase of automobiles and handed over the packages in return for cars which he drove back to Florida.* He states he now realizes there was cocaine in the packages but he asserts he did not know about the cocaine at the time he handed the packages over. He states he was never paid any money by Mr. Hanna beyond the $200.00 per week he earned for providing child care."

(Emphasis supplied). Based upon this factual account, the probation officer stated:

> "Despite his plea of guilty, *Mr. Urbano states he never knew he was transporting cocaine and never willingly had any involvement in cocaine trafficking.* No reduction is given."

14. The probation officer had recommended that Hanna be given a two level upward adjustment for obstruction of justice under Section 3C1.1. The district court determined that Hanna did not obstruct justice under the Guidelines and thus refused to accept the probation officer's recommendation.

15. The definition of acceptance of responsibility and standard of review are set forth at the beginning of Section VIII, *supra.*

(Emphasis supplied). Urbano contended that his guilty plea and his cooperation with law enforcement authorities in drug investigations entitled him to the acceptance of responsibility reduction. But the district court disagreed and ruled that:

> "[T]he statement [in the pre-sentence investigation report] does set forth what appears to be an accurate statement of this defendant's comments to the probation department. I believe its [sic] for the Court to determine whether or not there was acceptance of responsibility based upon those facts. I do think that there is kind of a mixed bag here, that Mr. Urbano has in some ways, by his actions and words, indicated an acceptance of responsibility, but in other ways apparently has attempted to minimize or mitigate that activity, which has, of course, resulted in a question as to his acceptance of responsibility.
>
> The Court feels that it would be very *difficult for a person to fly from Florida to O'Hare with seven ounces of cocaine or more strapped to your crotch and think that you were carrying some papers for used cars.* I grant you that they sometimes come in different packages and they are transported in different ways, *but I find hard to believe that anyone would think he was carrying titles to automobiles. And under those circumstances the Court will accept the summation of the probation department in that regard.*"

(Emphasis supplied).

Urbano's guilty plea and cooperation with the government in drug investigations weigh somewhat in favor of his acceptance of responsibility. But, the fact remains that Urbano continued to be untruthful and deny his knowing involvement in the conspiracy throughout the period of his interviews with the probation officer. The sentencing judge thoroughly weighed, reasoned and evaluated all of the facts and circumstances in the case and concluded that Urbano was not entitled to a downward acceptance of responsibility adjustment. As we noted in *Camargo:* " '[T]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility,' and thus the judge's determination 'is entitled to great deference on review and should not be disturbed unless it is without foundation.' " *Camargo,* 908 F.2d at 185. It was for the trial court to make the basic factual finding whether Urbano accepted responsibility for his crime. His conclusion that Urbano refused to admit to the responsibility for his crime is supported in the record. Under the applicable "clearly erroneous" standard of review, we are not left with the definite and firm conviction that an error was committed. Thus, we hold that the trial court's refusal to grant Urbano a two level adjustment for acceptance of responsibility was proper.

## IX. ADJUSTMENT FOR MITIGATING ROLE

The trial court refused to grant Urbano's request for a downward adjustment under § 3B1.2 of the Guidelines stating that he was not "such a peripheral player that he really had no major contribution to the success of the venture." [16] Urbano argues that he should have received either a downward adjustment of four points as a "minimal participant" in criminal activity or a downward adjustment of two points as a "minor participant" in this activity.

The pre-sentence investigation report recommended against enhancing Urbano's offense level for being an "organizer, manager or supervisor of any criminal activity." In discussing this question, the probation officer commented that: "The government identifies Thomas Hanna, William Osborne

**16.** Section 3B1.2 of the Guidelines provides:

"§ 3B1.2. *Mitigating Role*

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels."

and Tony Sciano as being more culpable than Mr. Urbano. Mr. Urbano is not identified as being an organizer, manager or supervisor of any criminal activity." The report also listed a more detailed description of the relative culpability of each of the defendants:

> "The government believes Mr. Hanna is the most culpable as he was the supplier of cocaine to Mr. Osborne and to Mr. Sciano. Mr. Osborne is next in culpability as he would purchase the cocaine from Mr. Hanna, cut and dilute it and resell for distribution. Mr. Sciano is next in culpability as he is believed to be a smaller dealer of cocaine than Mr. Osborne and he usually dealt the cocaine without further cutting or diluting. *Mr. Urbano made deliveries for Mr. Hanna to his customers and is viewed as next in culpability.* Ms. Bauer is the least culpable of the codefendants, as she was the girlfriend of Mr. Osborne and only made small deliveries of cocaine for him on an occasional basis."

(Emphasis supplied).

At the sentencing hearing Urbano argued that he should be granted an adjustment for playing a minor or minimal role in the conspiracy because "[h]e was not involved in the distribution of any of the substances here other than coming up here with sealed packages and acting as a mule, as a courier for Mr. Hanna." The government argued against any downward adjustment for Urbano's role stating that he "*did bring eleven ounces of cocaine to the Eastern District of Wisconsin,* which was then distributed by these other dealers." (Emphasis supplied). The trial judge denied Urbano's request for an adjustment that would adjudge him as either a minimal or minor participant in the criminal conduct. The court asked the government how many trips Urbano made transporting cocaine, and was told he had made two. The court concluded that although Urbano may not have been as culpable as certain other defendants, his activities did not warrant a reduction of his sentence. Downward adjustments for an individual's "minor" or "minimal" participation in the criminal activity, require factual determinations that must be free from clear error. *See United States v. Bigelow,* 914 F.2d 966, 975 (7th Cir.1990); *United States v. Tholl,* 895 F.2d 1178, 1186 (7th Cir.1990). We have emphasized that: "The Commentary to § 3B1.2 indicates that this section is limited to 'a defendant who plays a part in committing the offense that makes him *substantially* less culpable than the average participant' (emphasis added)." *Bigelow,* 914 F.2d at 976.

In urging a reduction for playing the role of a minor or minimal participant Urbano argues that he was merely a "mule" carrying drugs for the conspiracy's leader, Thomas Hanna. The Commentary to Section 3B1.2 of the Guidelines notes that a role as a courier may be sufficiently minor or minimal to permit an adjustment under this section of the Guidelines *where only a single transaction occurs.* Application Note 2 reads:

> "It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to off load part of a single marihuana shipment, or in a case where an individual who was recruited as a courier for a single smuggling transaction involving a small amount of drugs."

Although Urbano relies upon this application note, his provision of drug courier services on more than one occasion prevents him from even being considered as coming within its terms. Further, courts construing Section 3B1.2, Comment (n.2) of the Guidelines have denied the adjustment for being a "minor" or "minimal" participant, based upon the important role couriers play in a narcotics conspiracy. In one of the early cases construing this section, the Fifth Circuit held that the Application Note quoted above does not provide an automatic downward adjustment to drug couriers:

> "The example Buenrostro relies upon is part of an application note *restricting* use of the minimal participant adjustment. The example suggests that some couriers may appropriately receive the

reduction; it does not suggest that all couriers are entitled to a downward adjustment. As the district judge in this case *clearly recognized, couriers are an indispensable part of drug dealing networks. Without somebody to take the drugs across the border, the drugs will never reach their illicit market.* In addition, the mere fact that *a defendant was apprehended while acting as a courier does not imply that the defendant* is *only* a courier. *The district judge need not accept the defendant's self-serving account of his role in the drug organization.* Finally, *even if the defendant were purely a courier having no knowledge of the other aspects of the drug-dealing operation, the defendant might nonetheless be a highly culpable participant in the operation.* A courier who willingly *undertakes illegal transit without asking many questions is especially valuable to a criminal organization. When police apprehended a studiously ignorant courier, the organization can rest comfortably, knowing that its other operations remain hidden from the law.*

If the Sentencing Commission wished to establish a special downward adjustment for all drug couriers, it could easily have done so. It could have included courier status as a special offensive characteristic in § 2D1.1, the guideline setting the base offense level for drug traffickers. The Commission could have done so, but it did not."

*United States v. Buenrostro,* 868 F.2d 135, 138 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990) (emphasis in original and supplied). The court in *Buenrostro* went on to emphasize that the key question is the courier's culpability in comparison to the remaining participants in the conspiracy:

"In the end, Buenrostro's argument fails because § 3B1.2 turns upon culpability, not courier status. The background note to the section states that the section 'provides a range of adjustment for a defendant who plays a part in committing the offense that makes him *substantially less culpable* than the average participant.' Buenrostro may be a courier without being substantially less culpable than the average participant. Culpability is a determination requiring sensitivity to a variety of factors. In this case, the district court found that Buenrostro's culpability was comparable to that of the average participant. That finding is not clearly erroneous, and we will not disturb it."

*Id.* (emphasis in original).

Many courts that have subsequently considered the issue have followed the same approach as *Buenrostro.* For example, in *United States v. Williams,* 890 F.2d 102, 104 (8th Cir.1989), the Eighth Circuit noted that: "A defendant's status as a courier does not necessarily mean that he is less culpable than other participants in a drug operation." As the Tenth Circuit recently observed: "[T]his court will adopt no per se rule allowing a downward adjustment due solely to the fact that the defendant was a courier of illegal drugs." *United States v. Arredondo-Santos,* 911 F.2d 424, 426 (10th Cir.1990). The Tenth Circuit summed up the applicable law in the following manner:

"While the commentary [to the Sentencing Guidelines] indicates that some couriers may appropriately receive classification as minimal participants, it does not mandate this result for all couriers. *A drug smuggling operation has many participants; some may purchase, some may transport, some may distribute, and some may sell. All are indispensable to the operation. It would be unproductive to debate which function is the more culpable. It is for this reason the Commentary directs us to focus upon the defendant's knowledge and the activities of others. The ultimate determination of whether or not a defendant is* entitled to be classified as a minimal participant is heavily dependent upon the facts of each case, and each case must be judged separately. *The mere fact that a defendant is a courier in a drug-smuggling operation does not entitle that defendant to be classified as a minimal participant.*"

*United States v. Calderon–Porras,* 911 F.2d 421, 423–24 (10th Cir.1990) (citation omitted, emphasis in original and supplied). *See also United States v. Sanchez,* 908 F.2d 1443, 1449–50 (9th Cir.1990); *United States v. White,* 875 F.2d 427, 434 (4th Cir.1989).

We also have recognized the importance of couriers to a drug conspiracy. In *United States v. Briscoe,* 896 F.2d 1476, 1507 (7th Cir.1990), we noted that:

> "The defendants, in an effort to establish approximately six conspiracy networks, dissect the various links in the distribution chain, arguing that each is a single conspiracy in its own right, formed pursuant to a separate agreement. However, the defendants' argument completely ignores the interdependence among the members of the organizations: from the importers to the *couriers* to the distributors to the dealers."

(Emphasis supplied). As we also stated: "In our opinion the evidence adduced at trial establishes a well-knit network of importers, *couriers,* distributors and dealers, with many of the participants acting in more than one capacity." *Briscoe,* 896 F.2d at 1506 (emphasis supplied). Very clearly, the courier performs an important conveyance and/or transportation function in a drug conspiracy and is a necessary culpable member who helps insure the success of the overall conspiratorial drug distribution scheme.

The controlling standard, therefore, is whether Urbano was substantially less culpable than the conspiracy's remaining participants, Hanna, Osborne, Sciano and Bauer. We think not. The government acknowledged that Urbano played a somewhat lesser role than Hanna, the conspiracy's supplier and Osborne and Sciano, two of the operation's drug dealers. But Urbano's transportation of a total of eleven ounces of cocaine in two separate trips from Florida to Wisconsin certainly can be considered as nothing but playing an integral role in the conspiracy and does not serve to justify a lowering of his culpability to a level substantially below that of his co-conspirators. Thus, the trial court did not commit clear error in refusing to grant Urbano either a four level adjustment as a "minimal participant" or a two level adjustment as a "minor participant" in the involved criminal conduct.

## X. URBANO'S CRIMINAL HISTORY CATEGORY

Urbano challenges the district court's calculation of his criminal history category under the Guidelines. He argues that his March 21, 1983 conviction for unlawful use of a weapon was pursuant to a city ordinance rather than a state misdemeanor statute and should not be included in the determination of his criminal history category. The government and the probation officer contended that the conviction was pursuant to a state misdemeanor statute. Under section 4A1.2(c)(1) of the Guidelines the violation of a local ordinance is excluded from the computation of a defendant's criminal history unless it also constitutes a criminal offense under state law.[17]

Urbano's attorney and the court had the following colloquy on this issue:

> "MR. LOPEZ [Urbano's Attorney]: I am on the work sheet, page two, your Honor, the unlawful use of weapons charge 12–8–82. It is generally, in Illinois I can tell you, Judge, it is a class A misdemeanor. Here there shows no disposition of the case other than a $250.00 fine. And I notice that the

**17.** Section 4A1.2(c)(1) of the Guidelines provides in relevant part:

> "(c) **Sentences Counted and Excluded**
>
> Sentences for all felony offenses are counted. Sentences for misdemeanor and petty offenses are counted, except as follows:
>
> (1) Sentences for the following prior offenses and offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of at least a year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense:
>
> * * * * * *
>
> Local ordinance violations (excluding local ordinance violations that are also criminal offenses under state law)
>
> * * * * * *"

prosecuting authority appears to be Blue Island. There are numerous city statutes in Cook County that require possession of a gun permit and a local city registration. From what I can infer from the probation report here is this case was not a Class A misdemeanor, but was a city registration violation. Otherwise besides the amount of fine, there would be at least a year of supervision or a year probation to be imposed. That's how I can infer that, by the fact that the sentence is only a fine. Therefore we would believe that that should not be considered to be a conviction to be used in calculating criminal history points.

COURT: Is it your position that if this was a municipal ordinance violation that that would not be included in the calculations?

MR. LOPEZ: Yes, Judge. I believe it would be excluded under 4A.2(c)(1). I have had an opportunity to read the comments, and although the list here is not exhaustive, I believe it would be similar to local ordinance violations which are unspecified in 4A1.2(c) and paren (b). I have handled many unlawful use cases in the Northern District of Illinois, and they are either prosecuted through city registration or through state. I don't believe this is the type that was, because of the fine and because there is no disposition of probation. I can say one thing, if it was a state violation it would have been enhanced by the prior possession of stolen motor vehicle, which is a felony, and therefore would have been a felony unlawful use of weapon if prosecuted through the state. That's another factor which I considered in inferring that this particular disposition is in fact a local ordinance vilolation [sic] which many cities in Cook do have as an alternative to sentencing and as an alternative to the city actually getting on its behalf through the local prosecution of these types of offenses."

Later the court confronted Urbano's attorney concerning the documentation the probation officer furnished the court in support of a finding that the charge was a misdemeanor rather than an ordinance violation:

"COURT: Well, it does appear that he was on some kind of a probationary period for a year, because the last notation states that Judge Geraghty conditional discharge terminated 3–19–84.

Is Chapter 38, Article 31 a reference to the Illinois State Statutes?

MR. LOPEZ: Yes, it is, your Honor. I don't have—

COURT: Well, that seems to then take care of whether its an ordinance violation or not, does it not?

MR. LOPEZ: I believe that is not a UUW, that's a registration violation. A UUWE is a Chapter 3824.

COURT: If it was an ordinance violation they would have referred to it as an ordinance violation would they not? Giving the ordinance number?

MR. LOPEZ: They would have given the ordinance number and since I didn't have an opportunity to see that, I would think then that that would be a type of fishing or gaming violation of some sort, because that is a registration, failure to have a registration, rather than unlawfully using a weapon.

COURT: On the basis of this the Court is going to find that this was a misdemeanor, and will treat it as such for the purposes of this report."

The question of whether Urbano's conviction was under a state statute or a municipal ordinance is an issue of fact subject to review under the clearly erroneous standard. *Cf. United States v. Brown,* 899 F.2d 677, 679 (7th Cir.1990). The trial court found that Urbano's conviction was for a state misdemeanor violation rather than a municipal ordinance infraction. The trial court, at the request of the appellate court on the motion of the government, supplemented the record to include a certified copy of the alleged conviction record and the misdemeanor complaint upon which

the conviction was based. These documents reflect that the criminal conviction was, in fact, a state misdemeanor.

We note that the arguments of Urbano's attorney might very well be interpreted as an attempt to mislead the trial and appellate courts. Rules 8.4(c) and (d) of the American Bar Association Model Standards of Professional Conduct provide:

> "It is professional misconduct for a lawyer to:
>
> * * * * * *
>
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
>
> (d) engage in conduct that is prejudicial to the administration of justice...." [18]

Rule 3.3(a)(1) of the American Bar Association Model Standards of Professional Conduct further provides:

> "(a) A lawyer shall not knowingly:
>
> (1) make a false statement of material fact or law to a tribunal...."

The comment to Rule 3.3 of the Model Standards contains the following relevant language:

> "[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances when failure to make a disclosure is the equivalent of an affirmative misrepresentation."

If Urbano's trial attorney intended to contest the government's contention that the conviction was a state misdemeanor, he was obligated to secure a certified copy of the record of conviction from the Cook County Circuit Court. Urbano's attorney certainly had sufficient time to pursue this course of action as the pre-sentence report listing the misdemeanor (unlawful use of a weapon) conviction as part of Urbano's criminal history computation was prepared January 13, 1989, and was received by him on January 27, 1989, well before Urbano's February 6, 1989, sentencing date. Securing the necessary documentation was also important in this case because the trial and sentencing occurred in a Federal court located in the Eastern District of Wisconsin and the questioned conviction concerned an Illinois misdemeanor conviction. Furthermore, Urbano's attorney, went on to argue at the sentencing hearing that he had "handled many unlawful use cases in the Northern District of Illinois," and should be expected to be more familiar with Illinois conviction documentation practices than the Wisconsin-based Probation Officer. Because the record was contested and incomplete, we ultimately had to request the court to supplement the record to include certified copies from the Illinois state court record which constituted the only definitive means of determining whether Urbano's conviction was for a violation of a state law or a municipal ordinance and thus determine whether Urbano's attorney had in fact participated in an attempt to mislead the trial court.

Urbano's attorney, realizing that the record still was unclear, continued his misleading tactics in the appellate court through the briefing process. In his appellate brief, he argued:

> "The Trial Court accepted the presentence report's blanket assertion that the Appellant had a criminal history of II pursuant to Chapter Four of the guidelines. In dispute was a disposition considered by the court in the presentence report which reflected a fine. Probation treated it as a misdemeanor and counted it in the Appellant's criminal history. Counsel objected and argued it should be excluded. This was clearly erroneous since there was no clear disposition. *The Court more or less made a guess. This type of guess is not authorized by the guidelines.* The increase in offense level resulted in increased incarceration. *The Appellant did introduce the requisite*

**18.** The Illinois Rules of Professional Conduct contain essentially the same provisions in Rule 8.4(a)(4) and (5).

*information concerning the seriousness of the conviction. United States v. White,* 869 F.2d 822, 828 (5th Cir.1989). *The court outright rejected this information and chose to believe a probation officer unfamiliar with Illinois Law. This was clearly error and without foundation.* This Court should recognize a Category One level."

Urbano's Appellate Brief at 15–16 (emphasis supplied). This sharp criticism of the district judge demonstrates either intentional misrepresentation of fact to this court or gross negligence in asserting facts based on the attorney's own knowledge which "may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." Comment to Rule 3.3 of the Model Standards. In either instance, we have serious doubts concerning the question of whether Urbano's attorney has violated the ABA Model Standards of Professional Conduct.

Since Urbano's attorney preferred to continue his pattern of carelessness or intentional deception in this court rather than submit a certified copy of the state court record, we were forced to investigate the record ourselves. The state court record clearly demonstrates the Urbano's conviction was for a violation of state law as opposed to a municipal ordinance, as his attorney claimed.[19] Thus, the district court's action in characterizing the questioned conviction as a state misdemeanor in computing Urbano's criminal history when imposing sentence was proper.

## XI. WITHDRAWAL OF GUILTY PLEA

Osborne contends that he should be allowed to withdraw his guilty plea and that his conviction be set aside because the government breached its plea agreement. He asserts that, according to the plea agreement, the government agreed to recommend a two point adjustment for acceptance of responsibility. Osborne contends that the government violated this agreement when it introduced evidence concerning Osborne's obstruction of justice via threats on prosecution witnesses in an attempt to deny Osborne the acceptance of responsibility adjustment. Osborne further alleges that the government had agreed in the plea agreement, based upon the information it had available at the time, to recommend criminal history Category I under the Sentencing Guidelines, rather than Category III, as urged at the sentencing hearing. Osborne contends that these two examples of government violations of the plea agreement require that Osborne be permitted to withdraw his plea agreement or, at a minimum, that an evidentiary hearing be ordered on the issue of whether the government breached the plea agreement.

In *United States v. Sophie,* 900 F.2d 1064, 1071 (7th Cir.1990), we recognized that:

> "Plea agreements—and, logically, the sentence and immunity agreement that make up the alleged plea agreement in this case—are contracts, see *United States v. Ataya,* 864 F.2d 1324, 1329 (7th Cir.1988), and determining the existence and meaning of such contracts is governed by ordinary contract principles of offer and acceptance, *United States v. Delegal,* 678 F.2d 47, 50 (7th Cir.1982). Those principles in turn require that we examine the parties' reasonable expectations—an objective standard. *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985)."

Although an evidentiary hearing may at times be necessary to determine whether a plea agreement was breached, a hearing is not mandatory where there is nothing but a self-serving allegation on the part of the defendant, without support in the record, of the alleged breach of the plea agreement:

> "A district court does not have to hold an evidentiary hearing on a motion just because a party asks for one. An evidentiary hearing is necessary only if the party requesting the hearing raises a significant, disputed factual issue. The

19. The Certified Statement of Conviction and the Certified Copy of the Misdemeanor Complaint are reproduced in the appendix to this opinion.

question in this case is whether Pollak's submissions to the court were adequate to raise a disputed factual issue that was necessary to decide his motion; if not, no evidentiary hearing was necessary."

*Sophie*, 900 F.2d at 1071 (citation omitted).

We next examine the plea agreement the government made with the defendant concerning the acceptance of responsibility adjustment and the criminal history computation to determine whether the government breached the plea agreement or, alternatively, whether an evidentiary hearing is required on the question of whether the government breached the agreement. With respect to the issue of the acceptance of responsibility reduction, Osborne's argument that the government violated the agreement is without merit and it is a useless waste of judicial time to discuss the same. The plea agreement provided that:

> "The United States agrees:
>
> * * * * * *
>
> (b) If defendant continues to accept responsibility for his actions as part of the conspiracy charged in Count I of the indictment, defendant is entitled to a two-level reduction in his 'Base Offense Level' pursuant to § 3E1.1(a) of the Federal Sentencing Guidelines."

The agreement also provided that:

> "The *defendant further acknowledges and understands that if, prior to sentencing, the defendant violates any term or condition of this agreement, engages in further criminal activity,* or fails to appear before sentencing, *this agreement is voidable in the discretion of the United States.*"

(Emphasis supplied). The plea agreement further provided that:

> "As an express condition of this plea agreement, defendant agrees to cooperate fully and completely with the United States in its investigation of this and related matters and agrees to be interviewed by government agents, including agents of the United States Drug Enforcement Administration, about his knowledge of matters pertinent to the instant investigation and related matters, and to testify truthfully and completely at any and all subsequent trial, if necessary. *Defendant understands and acknowledges that if any time subsequent to entering into this agreement, he fails to cooperate as outlined above, said failure will constitute a material breach of this agreement.* In that event, defendant understands and acknowledges that his statements to law enforcement personnel made subsequent to this agreement will be considered as substantive evidence to be used against him at future court proceedings."

(Emphasis supplied). The agreement also stated:

> "Defendant further acknowledges and understands that the government reserves the *right to correct factual misstatements, if any, made at the time of sentencing. The government further reserves the right to be heard with respect to any post-sentence motions and/or reductions,* including but not limited to, Rule 35 motions for reduction of sentence."

(Emphasis supplied).

The government entered into this agreement on September 15, 1988, without the knowledge, obtained by law enforcement officials some two months thereafter in November of 1988, that Osborne sought the help of others to have the government witnesses Shirl Boomer and Randy Carroll "disappear." As West testified, Osborne stated he "could come up with some money" in order "to have Boomer disappear" and that Carroll "was another one [Osborne] would like to see disappear." Because the circumstances of Osborne's statements requesting the assistance of others in doing away with the government witnesses were unknown to any law enforcement official in September 1988, they were clearly unknown to federal prosecutors. As we recognized in *United States v. Ojo*, 916 F.2d 388, 393 (7th Cir.1990):

> "The application notes to § 3E1.1 in effect at the time of Witherspoon's sentencing precluded a reduction of sentence for acceptance of responsibility when that sentence had already been enhanced because of obstruction of justice under

§ 3C1.1, as in Witherspoon's case. Application note 4 to § 3E1.1 provided:

'An adjustment under this section is not warranted where a defendant perjures himself, suborns perjury, or otherwise obstructs the trial or the administration of justice (*see* § 3C1.1), regardless of other factors.' "

(Footnote omitted).[20] Once the government learned of Osborne's obstruction of justice in attempting to solicit the help of others to kill government witnesses, the government was entitled to withdraw from the plea agreement on the ground that Osborne was not accepting responsibility for his crime and in fact was discussing the planning of a more serious crime. Thus, the government did not breach the plea agreement, entered into before law enforcement authorities became aware of Osborne's criminal solicitation, when it refused to recommend an acceptance of responsibility adjustment.

Furthermore, the facts concerning Osborne's solicitation of persons to harm prosecution witnesses that were the basis of the government's refusal to recommend the acceptance of responsibility adjustment and that became known to the government in November 1988, were fully developed at Osborne's sentencing hearing. Thus, the trial court properly exercised its discretion and good judgment when it refused to waste more of the court's valuable time to hold a special evidentiary hearing on the factual issues relevant to the government's refusal to continue its recommendation of an acceptance of responsibility adjustment under the plea agreement. Indeed, after reading the record of the two day sentencing hearing, it might very well be considered a waste of the court's judicial resources. If Osborne's attorney had secured a further hearing on the alleged factual issues the deleterious effect would only have been magnified.

Osborne ridiculously further contends that the government was, in effect, "estopped" from urging the application of a criminal history category more serious than category I. He cites the term of the plea agreement, in which the government agreed:

"(c) Based upon information presently available to the United States, defendant's 'Criminal History Category' under § 5A of the Federal Sentencing Guidelines is I."

At the sentencing hearing, the government asserted:

"I also have, and I would like to have made part of the record, is Mr. Osborne's criminal record that was available to the United States at the time of the drafting of the plea agreement. And you will find on page five 10–C, a reference to the criminal record. Now this was made available to Mr. Osborne's first attorney, Tom Brush, it was made available to Mark Schroeder, Kevin Osborne, his second attorney, and the third attorney, Mark Schroeder, they have all had this. And that's all the government had as to criminal history for Mr. Osborne. Now probation and parole has come up with other items that obviously were in Mr. Osborne's knowledge that we did not know about. So I don't think he has any cause to complain...."

The government at the sentencing hearing urged that Osborne was in Criminal History Category III rather than Category I, relying upon two "operation of a motor vehicle while intoxicated" convictions that were not previously disclosed by the defendant and later uncovered by the Probation Office in the course of the pre-sentence investigation.[21] In reaching its determina-

20. This Application Note was amended, effective November 1, 1989, to read:

"Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply."

This amendment did not apply to Osborne's sentencing.

21. Osborne gave the following amorphous testimony concerning his disclosure of his prior convictions before entering into the plea agreement:

"Q [Mr. Shroeder, Osborne's attorney]: Did you, in the course of your discussions with

tion on the criminal history category, the court discussed Osborne's two operations of a motor vehicle while intoxicated offenses:

"With respect to the OWI offenses, this Court is disappointed that there isn't some proof here as to whether or not these are ordinance violations. I realize the government's position is that it doesn't make any difference, that if its [sic] OWI its [sic] OWI. The Court has some degree of familiarity with the original way in which drunken driving offenses were handled in the past. It does appear from the undisputed statements that [Osborne] was arrested by a town officer and went before a town municipal judge. Under those circumstances the Court is going to proceed on the assumption that the first offense was an offense that involved a local ordinance violation, and therefore no additional amount will be assessed for the offense that occurred as a result of the arrest on April 16, 1978. The Court, however, does feel that by 1983 these matters were handled under the state statutes, although there is no proof to that effect, I believe it is undisputed that that was generally the practice, if not totally the practice in Wisconsin, and therefore in the OWI offense, which the Court characterizes as a very serious offense, would be included. I find it very difficult, frankly, to understand how a person who is driving with an expired license should automatically get increased or a person who is found have trespassed onto somebody else's land should be increased, absent a thirty day imprisonment, and frankly there is no evidence here of any imprisonment of any kind, but I do feel that OWI by 1983 had progressed to the point of where it was a serious violation, and one that would not have to be handled with an imprisonment in order for this to be included. So we will add one point for the offense that occurred on May 8, 1983. And its' [sic] further fortified by the fact that he refused to submit to a breathalizer test, which is the threshold question here in Wisconsin and was in 1983." [22]

Based upon consideration of Osborne's entire criminal record, the court determined that: "The offense level is twenty-eight, criminal history category is two. The guideline range would be eighty-seven to a hundred and eight months imprisonment, and three to five year period of supervised release." The court departed downward from the Guideline range and sentenced Osborne to an eighty month term of imprisonment.

Osborne makes a bald statement and asserts that he was unaware that his two convictions for operating a motor vehicle while intoxicated were to be considered in the Guidelines' criminal history computa-

the agents prior to entering into [the] plea agreement, discuss OWI convictions?
A [OSBORNE]: Yes, I did. In fact even with my first attorney I discussed that. And I said, they asked me if I had any priors, and I said, 'Well, a few drunk driving and a few disorderlies and things like that'. And they, well, no, they meant felonies, serious crimes.
Q: This would be, when you say 'they', who are you referring to?
A: Both my attorneys and the prosecutor and the federal agents, the state agents."

Although Osborne claims to have made some type of general disclosure, his testimony did not give specific names or dates of conversations where this information was disclosed and it is evident that the government was unaware of the drunk driving convictions until the pre-sentence investigation.

22. The Guideline governing the question of whether the operation of a motor vehicle while intoxicated offenses should be counted in determining Osborne's criminal history is Section 4A1.2(c)(1), which provides in relevant part:

"(c) *Sentences counted and excluded*
Sentences for all felony offenses are counted. Sentences for misdemeanor and petty offenses are counted, except as follows:
(1) Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense:

* * * * * *

Local ordinance violations (excluding local ordinance violations that are also criminal offenses under state law)
* * * * "

tion.[23] Osborne also believes that because the government had access to Osborne's criminal record prior to September 1988, it should have been charged with knowledge of all of his prior convictions, irrespective of whether the government was subjectively aware of the convictions. In effect, Osborne argues to enforce the original plea agreement that, as a result of his refusal to make his full criminal history clear to the government, was based upon an understanding of his criminal record that did not include all of his convictions.

We remind Osborne that the government's representation concerning his criminal history category in the plea agreement was "[b]ased upon information presently available to the United States." As it stated to the court, the information the government had concerning Osborne's criminal record at the time it entered the plea agreement did not include specific and necessary information dealing with the drunken driving convictions that the probation officer later uncovered. The United States, unaware of Osborne's two "operating a motor vehicle while intoxicated" convictions prior to his plea agreement, obviously is free to urge application of a criminal history category that accurately reflects Osborne's complete criminal record after it has gained all of the necessary information concerning Osborne's criminal history. Furthermore, Osborne was informed at the time of the acceptance of his guilty plea that the court would order a pre-sentence investigation. Indeed, following the acceptance of the guilty plea, the Court informed Osborne:

> "Mr. Osborne, the Court is going to order a presentence investigation or report. And I don't know how much familiarity you have with it, but what it is, is that the United States Probation Department will conduct an investigation of your background and to determne [sic] certain facts that are to be considered in the determination of an appropriate sentence in this case. *Now, I am going to urge you to cooperate with them. You are not required to, but I am going to urge you to, for two reasons.* First of all it affords *you an opportunity to have some input into that report.* Secondly, it has a way of insuring *accuracy if you have cooperated with them and given them the information.* In most cases they will find it out anyway. Sometimes, like a lot of things, its [sic] worse when *it reaches them second hand than if it had come tio [sic] them directly from yu [sic]. So, with that in mind I am going to suggest that you cooperate with them, and the report will be prepared, and you will be afforded an opportunity to review the report and to suggest any modifications or additions that you feel are important.*"

(Emphasis supplied). Thus, at the time the court accepted Osborne's guilty plea it seems reasonable to assume that, Osborne, an individual experienced with the operation of the criminal justice system, was well aware of the fact that the probation office would examine his background and might discover facts he had not revealed to the government. Where a defendant has failed to fully disclose his complete criminal history during plea agreement negotiations, the government is not required to be bound by an inaccurate recitation of the defendant's criminal history.

We have previously disapproved of a defendant's attempt to improperly characterize the facts relevant to sentencing in order to receive a more favorable sentence. In *United States v. Bishop,* 774 F.2d 771, 773–74 (7th Cir.1985), a federal district court had granted a defendant's motion for reduction of sentence. The defendant's motion had requested that his three-year federal sentence be ordered to run concurrent with, rather than consecutive to, a thirty-four year state sentence. The defendant did not inform the district court, prior to its grant of the motion, that thirty of the thirty-four years of his state sentence had been vacated. A year after the federal court modified the defendant's sentence,

23. Osborne uses this as an excuse for failing to make any disclosure more specific than that detailed in footnote 21, *supra.*

and relying upon the information available to it at the time, the court learned of the vacation of the state sentence. The government, upon becoming aware of the reduction in the state sentence, moved to have the federal court vacate its order that the federal and state sentences run concurrently. Following an evidentiary hearing on this motion, the federal court

> "found that [the defendant] 'knew of the misrepresentation contained in his motion and knew that it would be material to the court's disposition on the motion' and that [the defendant] 'did not correct the motion or inform the court or his attorney of the misrepresentation, but instead purposely kept silent, intending that the court rely on the misrepresentation contained therein.'"

*Bishop*, 774 F.2d at 773. The district court then "vacated its order modifying [the defendant's] sentence and reimposed the three-year [consecutive] sentence for a conspiracy to distribute heroin." *Id.* We upheld the district court's disposition against the defendant's claim that it was untimely. We stated that the defendant's position was without merit because "courts have the inherent power to correct judgments obtained through fraud or intentional misrepresentation." *Bishop*, 774 F.2d at 773–74. We further quoted the Supreme Court's holding that:

> " 'Equitable relief against fraudulent judgments is not of statutory creation. It is a judicially devised remedy fashioned to relieve hardships which, from time to time, arise from a hard and fast adherence to another court-made rule, the general rule that judgments should not be disturbed after the term of their entry has expired. Created to avert the evils of archaic rigidity, this equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in the situations.' "

*Bishop*, 774 F.2d at 774 (quoting *Hazel–Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 248, 64 S.Ct. 997, 1002, 88 L.Ed. 1250 (1944)). As we stated: "The Court noted the appellate court's inherent authority to remedy the fraud perpetrated upon it and concluded that upon discovery of the fraud the court should place the parties in the same position as if the 'corruption had been exposed at the original trial.' " *Bishop*, 774 F.2d at 774 (quoting *Hazel–Atlas*, 322 U.S. at 250, 64 S.Ct. at 1003). We further noted that: "The fact that this case involves a fraud perpetrated upon the court during the criminal sentencing process rather than during a civil proceeding, such as in *Hazel–Atlas*, does not change the result." *Bishop*, 774 F.2d at 774 n. 5. As in *Bishop*, we will not permit a defendant to receive a more favorable sentence based upon an incomplete representation of the facts relevant to sentencing.

Our decision in *United States v. Billington*, 844 F.2d 445, 450–51 (7th Cir.1988) also supports our refusal to permit Osborne to rely upon a plea agreement entered on the basis of an incomplete criminal history. *Billington* involved a strikingly similar factual situation where the government had stated its understanding in a plea agreement that the defendant had dealt a particular quantity of drugs, but learned after entry into the plea agreement that the defendant had dealt a larger drug quantity. The defendant filed a motion requesting specific performance of the plea agreement to prevent the government from submitting the more accurate evidence of the quantity of the drug transactions at the sentencing hearing. Billington contended this offer of proof "violated the terms of the plea agreement and would result in a longer period of incarceration under the then applicable paroling policy guidelines set forth in 28 C.F.R. § 2.20 (1986)." *Billington*, 844 F.2d at 446.[24] We rejected the

24. Specifically, we noted that:
"In Billington's case, based on the 1 kilogram of cocaine mentioned in ¶ 11 of the plea agreement, his offense would have been rated in Category 5, and thus he would not be considered for parole until he served at least 24 to 36 months in confinement. With the increased quantities of cocaine recited in the government's offer of proof, the parole guidelines elevate the crime to a Category 6 offense

defendant's attempt to compel the government and the court to honor the defendant's incomplete and inaccurate factual representation concerning the involved amount of drugs, observing:

> "Billington asserts that his plea 'rested in a significant degree on the promises of the prosecutor which were broken.' Here, Billington is referring to the prosecution's October 3, 1986, Offer of Proof containing information inconsistent with the facts included in ¶ 11, i.e., that Billington supplied at least four to six kilograms of cocaine rather than the one kilogram cocaine described in ¶ 11. However, the record clearly reveals that Billington was provided an opportunity (two-week period) to fully reconsider and withdraw his plea after he was fully apprised that the court would consider all relevant information regarding his offense severity including quantities of cocaine in excess of one kilogram at sentencing and not just the facts contained in ¶ 11 of the plea agreement. Further, we observed that at the time the initial plea agreement was executed, Billington was fully aware that ¶ 11 incompletely and inaccurately described the quantity of cocaine he was personally involved with while an active participant of the drug conspiracy. Thus, Billington could not have reasonably anticipated excluding from the record all other accurate and relevant information regarding his role in the conspiracy."

*Billington,* 844 F.2d at 450 (citation omitted). Similarly, it is proper to conclude that Osborne, not a first offender and thus familiar with the criminal justice system, was well aware, at the time of his interview and entry into the plea agreement, that he was failing to give an accurate recitation of his arrests and criminal history. Osborne had repeated experience in dealing with law enforcement personnel and the courts which included six arrests and five convictions.[25] Osborne's experience in dealing with prosecutors and the criminal courts clearly should have made him aware that misdemeanors are crimes and will be considered in determining the extent of his criminal history. In *Billington* we concluded that the defendant's "ultimate guilty 'plea was thus in no sense the product of governmental deception; it rested on no "unfulfilled promise" and fully satisfied the test for voluntariness and intelligence.' " *Billington,* 844 F.2d at 450 (quoting *Mabry v. Johnson,* 467 U.S. 504, 510, 104 S.Ct. 2543, 2548, 81 L.Ed.2d 437 (1984)). We are convinced that the same rationale applies to this case and that the government did not breach the plea agreement when it recommended an increased criminal history category rather than Category I and denial of the downward adjustment for acceptance of responsibility. Furthermore, because the facts concerning Osborne's criminal record and acceptance of responsibility were fully developed at the sentencing hearing, there was no need for an additional evidentiary hearing to resolve factual issues relevant to the question of whether the plea agreement was breached.

In sentencing the defendants the court properly applied the Sentencing Guidelines and its findings of fact were not clearly erroneous and the government did not breach its plea agreement with Osborne.

AFFIRMED.

> and require that he serve at least a 40- to 52-month period of incarceration. Thus, in hopes of limiting the length of his imprisonment to the original 24 to 36 months (for one kilo), Billington filed a motion with the court requesting the issuance of an order for specific performance of the plea agreement."

*Billington,* 844 F.2d at 447.

25. As discussed previously, Osborne had two convictions for operating a motor vehicle while intoxicated. Furthermore, Osborne had a 1985 conviction for criminal damage to property in Lake County, Illinois. Osborne's criminal history also included a 1979 conviction for operating a motor vehicle while intoxicated, a 1984 conviction for a local ordinance violation for assault involving the use of a gun and a 1987 arrest for reckless use of a firearm. As the probation officer recounts, the 1987 "charges were dismissed by the district attorney in favor of the present federal prosecution."

# APPENDIX

(CR-1 1/82) CCG-40B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

vs.

Urbano, Joseph

GENERAL NO. 82mc6011892:01

AURELIA PUCINSKI CERTIFIED STATEMENT OF CONVICTION

I, [redacted] Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the records of the Circuit Court of Cook County show that:

1. On 4 December 1982 (date) the State's Attorney of Cook County filed an information [ ], complaint [X] number 82mc6011892 charging the above named defendant with Criminal damage to Property, Unlawful firearm Possession, Unlawful Use of Weapons, Reckless Conduct, & Resisting a Police officer (offense)

2. On ........ (date) the above named defendant, while represented by counsel, was duly arraigned before the Honorable ........ of the Circuit Court of Cook County and entered a plea of not guilty to ........

3. A trial by jury was waived by the defendant, who was represented by counsel and thereafter the Court found the defendant guilty of Unlawful Use of Weapons (offense)

4. On 21 March 1983 (date) the above named defendant, while represented by counsel, was duly arraigned before the Honorable Judge Kierach of the Circuit Court of Cook County, Illinois, the defendant was fully advised of his rights and while represented by counsel entered a plea of guilty to Unlawful use of Weapons (offense)

5. On 21 March 1983 judgment was entered on the conviction and the defendant was sentenced by the Honorable Judge Kierach to 1 year Conditional discharge

I hereby certify that the foregoing has been entered of record on the above captioned case.

Date: 30 November, 1990.

Aurelia Pucinski C.C.

AURELIA PUCINSKI

Clerk of the Circuit Court of Cook County

AURELIA PUCINSKI

[redacted] CLERK OF THE CIRCUIT COURT OF COOK COUNTY

1170

(Court Branch) 1-10-82 @ 10:30 A.M. (Court Date)

R-2

MISDEMEANOR COMPLAINT

(7-81) CCMC1-225

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of the State of Illinois
Plaintiff

v.

NO. B. I. 659-82 820-011892

Joseph Urbano
Defendant

Officer Gary John ston #154 (Complainant's Name Printed or Typed) complainant, now appears before

The Circuit Court of Cook County and states that

Joseph Urbano (defendant) 12015 Ann Street, Blue Island, Il (address) has, on or about

December 3, 1982 (date) at 2600 Blk of Collins Street Blue Island, Il (place of offense) in Cook County

committed the offense of Unlawful use of Weapons in that he knowingly carried a firearm to wit: a 25 calibre Beretta model 950 BS, Serial # BER 54282V with 8 live rounds at the Maplewood Inn which was licensed to sell intoxicating beverages

in violation of Chapter 38 Section 24-1(A)(8)

ILLINOIS REVISED STATUTES

(Complainant's Signature)

| Date JAN 10 1983 |
|---|
| Rm. 205 Time 10:30 AM |
| 16515 S. Kedzie Pky., Markham, IL |
| Branch 20 6th District |

STATE OF ILLINOIS } ss
COUNTY OF COOK

13031 Greenwood Ave., Blue Island, Il (Complainant's Address) 579-8600 (Telephone No.)

Officer Gary Johnston #154 (Complainant's Name Printed or Typed)

being first duly sworn, on his oath, deposes and says that he has read the foregoing complaint by him subscribed and that the same is true.

(Complainant's Signature)

Subscribed and sworn to before me 3 December, 19 82

Morgan M. Finley (Judge or Clerk) on view arrest

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

Summons issued, Judge
or
Warrant Issued, Bail set at
or
Bail set at $1,000.00 10% applies Judge Rule of Court

MORGAN M. FINLEY, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

I HEREBY CERTIFY THE ABOVE TO BE CORRECT.

DATE 11-30-90

Aurelia Pucinski

CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILL.

THIS ORDER IS THE COMMAND OF THE CIRCUIT COURT AND VIOLATION THEREOF IS SUBJECT TO THE PENALTY OF THE LAW