**UNITED STATES of America, Plaintiff,**

v.

**Mario CLAIBORNE, also known as Chuck, Defendant.**

**No. 91 CR 463.**

United States District Court, N.D. Illinois, E.D.

Oct. 19, 1992.

Colleen Coughlin, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Robert Clarke, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Presently before the court is the government's motion to vacate the plea agreement it entered into with defendant Mario Claiborne. For the reasons set forth below, we grant the government's motion.

### I. Background

Mario Claiborne was arrested on June 14, 1991, and subsequently charged in the thirty-seven count, superseding indictment with violations of 21 U.S.C. §§ 841(a), 843(b), 846, 848, and 18 U.S.C. § 1956(a)(1)(B)(i). Prior to trial, Claiborne entered into a plea agreement with the government, in which he agreed to plead guilty to Counts I (conspiring to possess with the intent to distribute narcotic drugs and to use and cause others to use telephones in committing drug trafficking offenses), XXXIII (conducting a financial transaction affecting interstate commerce, while using and concealing narcotics proceeds) and XXXIV (same) of the superseding indictment in return for a sentence of twenty-two years imprisonment on Count I and no consecutive sentences of incarceration imposed as to Counts XXXIII and

XXXIV. Additionally, Claiborne agreed that he would

cooperate fully with the government in any investigation in which he is called upon to cooperate that is related to or results from the charges in this case. Defendant agrees to provide complete and truthful information to government investigators, including truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding.

After making an independent determination that there was a factual basis for the plea, that the conduct admitted to by Claiborne constituted the offenses charged in the superseding indictment, and that Claiborne understood both the nature of the charges and the consequences of his plea, this court accepted Claiborne's guilty plea on October 1, 1991.

Claiborne began to fulfill his obligations under the plea agreement on September 19, 1991, giving the following statement under oath to a grand jury of the United States:

I am Mario Claiborne, and I am the individual named in indictment 91 CR 463. I am also called Chuck. The following statement is a brief summary of events since about the summer of 1986 to about June 14, 1991. It is not intended to be complete and is not complete as to who was involved, the quantities of narcotics involved, or the nature of the people's involvement during those years. Where possible, I have given complete names as well as nicknames. However, I do not know or recall some people's complete names at this time. I may recall complete names if I am allowed to review reports or memoranda, if any exist, that record the names. I have not reviewed any reports or memoranda before today. I have listened to a few of the tape-recorded conversations from the wire tap of the three phones at my two houses for the purpose of identifying voices.

Since in or about the summer of 1986 until June 14, 1991, I engaged in a continuing criminal enterprise by committing a series of felony violations, specifically I ran a narcotics trafficking business. I was assisted in that business by at least five other people, including Patrick Greer, Eula Scott, also called Boo, Donna Hurns, Christopher Epison, Carlos Curry, also called Lil' Chuck, Don Smith, Tyrone Helse, Larry Martin, Harold Williams and Leland Leghette, and I acted as an organizer, supervisor or manager of those people. These people did not necessarily all work for me at the same time or all the time since 1986. For example, since 1986 there were times when Scott had nothing to do with my business. Since 1986 and up to and including June 14, 1991, I have not had a legitimate source of income. I have obtained substantial income and resources from my drug trafficking business.

I operated a narcotics distribution business in Chicago, Illinois and Gary, Indiana. In my narcotics business, the people and their positions within the business changed over time. Sometimes, people played several roles at the same time, such as working for me and selling me cocaine or heroin. For the most part, I purchased, packaged and distributed cocaine in my business but from time to time I would purchase heroin and deliver some of that heroin to others, including Patrick Greer. I obtained cocaine at various times from many different sources, including Johnnie Fort, Eduardo Castille and Tyrone Helse, and I obtained heroin from many sources, including Eric Myers and Tyrone Helse.

Workers, including Scott, Hurns, Curry and Helse would accept delivery from sources and present the payment for the narcotics when I was not present. After purchasing narcotics from those sources, I and workers cut and packaged the narcotics into various-sized packages, the cocaine packages ranging in weight from quarter ounce to kilogram, and the heroin packages ranging in weight from grams to ounces. Scott and Hurns would hold money and sometimes narcotics for me at my direction.

I and others at my direction, including Epison, Curry, Smith, Hurns, Scott, Helse, Greer, Martin, David Williams and Leland Leghette took orders for narcot-

ics over the telephone, telephoned other workers, including Greer, Jerome Jozwiak, Stanley Wright, Harold Williams, Martin and Schawana Lunford who is Greer's girlfriend and worked for him, and wholesale customers, including Deral Willis, "Viv," "Tutu," "Bert," "Lois," Fredrick Hicks, also known as "Midnight," Danny Christopher, Gary Igert and Jozwiak, and instructed them to pick up their packages of narcotics. Also, I and others, including Curry, Smith Helse, Epison, Harold Williams and Leghette delivered cocaine packages to workers and wholesale customers.

Workers and some of the wholesale customers would then divide the cocaine into smaller-weight packages, which were then distributed to street dealers who were located for the most part in the 44th and Greenwood area. Since about 1987, the street dealers "cooked" almost all of the cocaine into cocaine base or "crack." The street dealers then sold the packets and turned the money in to the person from whom they had taken the packets. Workers, including Curry, Smith, Helse, Harold Williams, Martin, Epison, David Williams, Leghette and Coleman, brought the money from the narcotics sale back to me.

We referred to cocaine as "work," "package," "thing," "racing gas," "gallons," "pistons," "speakers," "woofers," "girl," "blow," "one half or quarter mile," and "cake."

We referred to heroin as "piece/slice of cake," "brown sugar," "boy," "chocolate chip cookies," "vanilla wafers," "Bobby," "Bobby Brown," and "brown."

During the five years that I distributed drugs, I and the people who worked for me or purchased from me used telephones and pagers a great deal in conducting our drug business.

Since 1986, but at different times, Patrick Greer, Larry Martin and Tyrone Helse have worked closely with me and knew about my entire operation. Greer, Martin and Helse were more trusted and had more responsibilities than people like Curry and Smith. Martin was my partner for awhile. Martin and Helse now distribute narcotics on their own, but still buy cocaine from me occasionally. Greer also has his own cocaine operation in the Gary, Indiana area. Martin always cooked the cocaine into crack. Two of Martin's workers were Stanley and Alphonso Wright. Those two worked for Martin and me when Martin was my partner.

During the course of the conspiracy, no less than 15 kilograms of cocaine base were distributed by me or the people working for me.

Between August and October 1989, I bought the house at 14817 Grant Street, Dolton, Illinois with illegal drug proceeds. Helse asked his brother-in-law, William Richardson, to buy the house for me. Richardson used my money, but he put the house in his name so that it could not be traced to me. I gave Helse and Richardson at least $80,000 to buy the house in Dolton, Illinois. I lived at 14817 Grant Street, Dolton, Illinois with Eula Scott.

I also lived at 3509 Fountainbleu in Hazel Crest, Illinois with Donna Hurns. In or about July 1990, I gave Hurns at least $30,000 of money I had made in my drug trafficking business. Hurns then arranged with her mother, Lore Goodrich, to act as the purchaser of the house and to put her name on all the papers, including the title to the property and the mortgage note so that my name and Hurns' name would not appear as the owners of record. Hurns and Goodrich both knew that the money for the house came from selling narcotics.

From on or about September 25, 1990 until June 14, 1991, I gave Hurns money from my drug trafficking business to make the mortgage payments on 3509 Fountainbleu, Hazel Crest.

On April 10, 1992, the government called upon Claiborne to testify as a witness in the trial of Claiborne's co-defendants. After a routine inquiry into the witnesses' background, Assistant United States Attorney Colleen Coughlin asked Claiborne if he was testifying pursuant to a plea agreement, to which he stated "No." Transcript

at 229, line 22. No doubt surprised by Claiborne's answer, Coughlin asked: "What brings you before the Court to testify today?" *Id.* at 229, line 23. In response, Claiborne declared that he "was threatened to testify in this case." *Id.* at 229, line 24. The presiding Judge, the Honorable Rudy Lozano, United States District Judge for the Northern District of Indiana, sitting by designation as a United States District Judge for the Northern District of Illinois, immediately conducted a sidebar, recessing the proceedings until April 13, 1992.

On April 14, 1992, Judge Lozano allowed the government to conduct outside the presence of the jury a voir dire examination of Claiborne respecting the alleged threats. After obtaining a grant of immunity, Claiborne testified that he received six threats regarding his cooperation at trial. First, Claiborne claimed that, on the day he was arrested, a DEA agent told him that he would "never see the street again." *Id.* at 342, line 6. Second, Claiborne maintained that an agent told co-defendant Carlos Curry that if Claiborne did not cooperate with the government, Claiborne's mother would be arrested. *Id.* at 343, lines 18–19. Third, Claiborne stated that Assistant United States Attorney Coughlin promised that he "would get life plus ten" for failing to abide by the plea agreement. *Id.* at 350, lines 5–6. The fourth purported threat came from the El Rukns, warning Claiborne not to testify at the trial. *Id.* at 350, lines 18–19. These alleged threats came both before and after Claiborne's plea on October 1, 1991. *Id.* at 350–56. Claiborne further claimed that IRS Agent Kevin Moss told Claiborne that the government was going to arrest or indict his mother. *Id.* at 375, lines 6–15. Finally, Claiborne testified that a government witness, Larry Martin, informed Claiborne that another government witness, David Williams, declared that Claiborne "better testify in this case so it wouldn't mess up [Davis Williams'] deal he got with the government." *Id.* at 357, lines 21–22. Additionally, during the voir dire examination, Claiborne testified that his statement before the grand jury was false, and was given only as a result of threats by the government. *Id.* at 372–73, 381–83.

Following the voir dire examination, Claiborne was recalled as a hostile witness and examined by the government in the presence of the jury. When questioned about the plea agreement he entered into with the government, Claiborne admitted signing the document, but maintained that he had never reviewed its content with his attorney. *Id.* at 538, lines 7–15. When presented with the document, Claiborne claimed that he did not recognize it and denied ever seeing it. *Id.* at 532–37. Claiborne then repeated his testimony concerning the alleged threats and the falsity of his statement before the grand jury. *Id.* at 568–72. Claiborne concluded his testimony on direct examination by repeatedly responding to each question posed that he did not remember. *Id.* at 716–809, 859–923. After cross-examination by two co-defendants, Claiborne refused to answer any further questions. *Id.* at 1007–08. Having completely disregarded the court's orders to answer, Claiborne was held in contempt. Judge Lozano denied defendants' motion for a mistrial and struck Claiborne's testimony in its entirety, instructing the jury to disregard, and draw no inferences from, his statements. *Id.* at 1222–23.

## II. Discussion

There is no question that the vast majority of Claiborne's statements at trial are contradictory of his testimony before the grand jury. Indeed, Claiborne does not, and cannot, dispute that he testified under oath untruthfully at one or both of these proceedings. Claiborne's Answer to the Government's Motion to Revoke Plea Agreement at 2 ("The transcript is replete with statements by the defendant which not only can be interpreted as contradictory of earlier assertions to this court and to the Grand Jury but are contradictory of statements made on the same day or the day before in front of Judge Lozano."). Instead, Claiborne raises the following arguments in opposition to the government's motion: (1) that he was not competent to testify at trial and, as such, any testimony given at trial cannot serve as the basis for

a violation of the plea agreement; (2) that his prior counsel rendered ineffective assistance of counsel; (3) that the contradictory statements and his refusal to cooperate are explained by alleged threats made to him; and (4) that despite the contradictions, his testimony at trial constituted substantial compliance with his obligations under the plea agreement as defendants were in fact convicted. Finding that Claiborne has failed to raise "a significant, disputed factual issue," we resolve the government's motion without an evidentiary hearing. *United States v. Osborne*, 931 F.2d 1139, 1162 (7th Cir.1991); *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990).

### A. Competency

■ The gravamen of Claiborne's competency argument is as follows. As a result of his prior drug usage, Claiborne's memory has deteriorated to the point that, at the time of his co-defendants' trial, he was no longer competent to testify. Without capacity, Claiborne contends that his testimony at trial is null and void and, as such, he could not have breached his plea agreement by virtue of those statements. Claiborne's assertion, however, proves too much. If, in fact, Claiborne was incompetent to testify at trial in April of 1992, then we can only conclude that he very well may have been incompetent at the time he entered into the plea agreement, rendering it null and void. However, we need not delve into this issue of timing as Claiborne has failed to present any evidence indicating that he was incompetent to testify at trial, much less warranting an evidentiary hearing.

The issue of Claiborne's competency was first brought to Judge Lozano's attention on April 10, 1992, during a side bar at which one of co-defendants' attorneys stated:

Mr. Claiborne [sic] when I would ask him a question and he would say left, when he was asked the same question he said right. If I said—if I asked him a question he said black. When asked the same question he said white. I want to go into a line of questioning with Mr. Claiborne concerning his prior drug usage and the effects of his memory.

Transcript at 396, lines 18–23. Judge Lozano allowed such an inquiry, leading to the following colloquy:

Q. Mr. Claiborne, first I want to ask you about Judge Aspen.

A. Yes.

Q. You were asked some questions about whenever you were in front of Judge Aspen, there was a court reporter present, and you were with one of your attorneys, and the Government attorney was there?

A. Yes.

Q. Do you remember that. When you were being asked questions about being in front of Judge Aspen, does that mean in the courtroom?

A. I guess—yes.

Q. When you testified that you had this conversation with Judge Aspen, was it in the courtroom or in his chambers?

A. In his chambers.

Q. Was there a court reporter in his chambers?

A. I don't remember.

Q. What does his chambers look like?

A. A room, a big room.

Q. Okay. Could you get a little more specific about what this room looked like.

A. A room with a desk in it, and I think couches.

Q. Mr. Claiborne, I asked you a number of questions, and Ms. Coughlin asked you basically a lot of the same questions, and your answers were totally different. Would you agree with that statement that I made? That a lot of the questions I asked you, your answers were different than hers—when she asked you basically the same questions?

A. I don't know.

Q. Okay. Mr. Claiborne, in your life, have you ever used any drugs?

A. Yes.

Q. What drugs have you used?

A. I used cocaine and heroin.

Q. And when you used cocaine, did you use it in both powder form and rock form?

A. No, just powder form.

Q. Okay. You never smoked heroin—cocaine?

A. No.

Q. When you used heroin, how did you use heroin?

A. In powder form.

Q. Shoot it up or snort it up?

A. Snort it up.

Q. Did you ever use cocaine and heroin mixed together like a speedball?

A. Yes.

Q. Did you ever use any other drugs other than cocaine separately, heroin separately, and cocaine and heroin mixture?

A. No.

Q. Over what period of time did you use these drugs?

A. Off and on since '86.

Q. Would you say at any point in your life you were addicted to any of these drugs?

A. Yes.

Q. What effect, if you know, has your drug use had on your memory and ability to recall?

A. I don't know.

Q. Do you remember everything you say from one day to the next?

A. No.

Q. Do you remember things that you said or did a year ago and more than a year ago.

A. Some things I do, some things I don't.

Q. Some days does your memory fade in and out?

A. I don't know.

Q. Okay. Was your memory like this before you used drugs?

A. I don't know.

Q. You don't remember how your memory was before you used drugs?

A. No, I don't.

Q. Have you used any drugs since June 13, 1991?

A. No.

*Id.* at 399–402. After considering this testimony, Judge Lozano implicitly concluded that Claiborne was competent to testify, as Claiborne was called as a witness on April 15, 1992. Furthermore, based on a conversation with his client, on April 16, 1992, Claiborne's attorney requested that the court order a psychiatric examination of Claiborne. *Id.* at 836–38. Upon consideration of the "tenor and mien" of Claiborne, as well as the substance of the elicited testimony, Judge Lozano denied the request and ordered Claiborne to continue to testify. We defer to Judge Lozano's finding regarding Claiborne's competency.

### B. Ineffective Assistance of Counsel

██ During his first few minutes on the witness stand on April 10, 1992, Claiborne declared that he was testifying under threat. The court immediately recessed the trial until April 13, 1992, giving Claiborne the opportunity to confer with his attorney. His attorney at the time advised him not to testify, presumably to save Claiborne from further perjuring himself. In an effort to establish the nature of these threats, the government served Claiborne's attorney with a subpoena on April 14, 1992. Accordingly, the court appointed Claiborne new counsel, who made his first appearance on April 15, 1992. Given the unambiguous terms of the plea agreement, present counsel advised Claiborne to continue to testify at trial. In light of the conflicting advice, Claiborne now posits that his prior counsel rendered ineffective assistance of counsel. We disagree.

As enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming that he was denied his Sixth Amendment right to effective assistance of counsel must demonstrate both "that his trial counsel's performance was constitutionally deficient and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Limehouse,* 950 F.2d 501, 503 (7th Cir.1991) (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068), *cert. denied,* —— U.S. ——, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992). As-

suming that he can "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy,'" *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)), Claiborne nonetheless has failed to demonstrate a reasonable probability that, but for prior counsel's advice, the result of the proceeding would have been different. Indeed, to the extent that prior counsel's advice may have misled him regarding his obligation to testify, Claiborne received present counsel's admonition to testify prior to being recalled to the stand. Claiborne's claim of ineffective assistance of counsel falls with present counsel's advice, no matter whether it was heeded.

### C. The Alleged Threats

■ Claiborne initially attempted to explain his testimony and conduct at trial as responses to conflicting threats made to him by the government, his co-defendants and the El Rukns. He now admits that the purported threats made by the various government officials are baseless. Claiborne's Answer to the Government's Motion to Revoke Plea Agreement at 7 ("The so called threats by the government appear to be no more than statements of harsh fact: that if he did not testify he was liable to face a life sentence."). Respecting the alleged threats made by the El Rukns and his co-defendants, although we take these allegations (as all allegations of coercion and threat) seriously, we do not believe they excuse Claiborne's false testimony at trial.

Significantly, this court, Judge Lozano and the government responded to the alleged threats with prudence and speed. Claiborne was aware of these threats months prior to trial and, in fact, conveyed them to this court during an in camera proceeding. At that time, Claiborne alleged that his girlfriend, Eula Scott, had been frightened and her house ransacked because of his cooperation with the government. In response, we allowed the government to contact Scott through the Dolton, Illinois police department in order to verify Claiborne's allegation and offer appropriate

protection. Subsequently, upon learning that Claiborne may have received threats from various members of the El Rukns, the government offered to move Claiborne, his mother, his sister and anyone else Claiborne believed was at risk of retaliatory violence by the El Rukns. Claiborne refused this offer on behalf of himself and his family. Further, Claiborne refused the government's offer to seal the courtroom during his voir dire examination. Rather than accept the abundant assistance as offered, Claiborne opted to testify untruthfully. There is no question that the consequences of this decision are stern, placing Claiborne in breach of his plea agreement. Nonetheless, in light of the history of the case, it is a decision that cannot be excused by repeated allegations of threat.

### D. Substantial Compliance

■ As a final effort to preserve the plea agreement, Claiborne asserts that he had testified to enough facts at trial to convict his co-defendants. This court, however, need not scrutinize the substance of Claiborne's testimony. Finding his testimony incredible, Judge Lozano was forced to strike Claiborne's testimony in its entirety. That his co-defendants were convicted is of no consequence to Claiborne. Indeed, they were convicted despite his failure to testify, not because of it. When entering into the plea agreement with Claiborne, the government was entitled to expect that Claiborne's cooperation would include truthful testimony against his co-defendants at trial. Given his conduct at trial after answering the question, "Are you testifying pursuant to a plea agreement?," we find that Claiborne has substantially breached the plea agreement.

### III. Conclusion

As Claiborne has substantially breached his obligations under the plea agreement, we declare the agreement null and void and vacate his plea of guilty. His trial on the charges in the indictment is set for January 11, 1993. Because of the interests of justice, time is excluded under the Speedy

Trial Act until January 11, 1993.[1] It is so ordered.

---

1. Time is excluded for the time the government's motion has been under advisement and because of the economy of judicial resources which will be achieved by trying Claiborne in a joint trial with co-defendant Tyrone Helse, previously scheduled for January 11, 1993.